```
 1    MJ:  All right.
 2       The Court understands that there's been pretrial confinement
 3    since 12 October '98.
 4       Is that correct?
 5    TC:  Yes, Your Honor.
 6    MJ:  Is that correct?
 7    DC:  That's correct, Your Honor.
 8    MJ:  All right.
 9       And also, Defense, you have an issue as to Article 13 for some
10    of the conditions of the accused's confinement in Mannheim
11    Confinement Facility.  Is that correct?
12    DC:  Yes, Your Honor.
13    MJ:  Are those conditions still in effect?
14    DC:  Yes, Your Honor.
15    MJ:  Are counsel ready to litigate that today?
16    TC:  The Government is, Your Honor.
17    DC:  Well, if the Government wants to call the witnesses, Your
18    Honor, we can do it today.
19    MJ:  Well, all right.
20       The Court notes that in an 802 session----
21       Basically, the substance of your issue is the basis on which
22    the Commander of the Confinement Facility ordered administrative
23    segregation.  Is that correct?
24    DC:  Yes, Your Honor.
25    MJ:  Do you all want to litigate it today at noon?
```

ART. 39(A)/14JAN'99                   6                              HANAU

```
 1              MASTER SERGEANT CARLOS M. PEREZ, called as a
 2   witness by the prosecution, was sworn and testified as
 3   follows:
 4                      DIRECT EXAMINATION
 5   BY THE PROSECUTION:
 6        Q.   Please state your full name.
 7        A.   Carlos M. Perez.
 8        Q.   Your rank?.
 9        A.   Master Sergeant, U.S. Army.
10        Q.   Unit?
11        A.   9th Military Police Detachment.
12        Q.   Social Security Number?
13        A.   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.
14        Q.   What is your MOS, Master Sergeant Perez?
15        A.   I'm a 95-Charlie, a Correctional NCO.
16        Q.   How long have you held that MOS?
17        A.   Since 1980.
18        Q.   In what confinement facilities have you worked in
19   the past?
20        A.   I worked at the Retrieving Brigade in Fort Riley,
21   Kansas.  The Detention Facility in Panama.  United States
22   Disciplinary Barracks in Fort Leavenworth.  The Regional
23   Confinement Facility in Fort Hood.  The Detention Facility
24   in Korea.  And the present facility, the U.S. Army
25   Confinement Facility, Europe.
```

1    Q.   Master Sergeant Perez, what is your current duty
2  position?
3    A.   I am the Chief of Correctional Supervision Branch
4  in the U.S. Army Confinement Facility, Europe.
5    Q.   In that duty position, do you have recommendations
6  to make to the Commander concerning the Administrative
7  Segregation of pretrial detainees?
8    A.   Yes, sir. I'm the Advisor to my Commander on
9  issues pertaining to custody and control of the inmates or
10 detainees.
11   Q.   In your 19 years in the "Corrections Business", how many
12 times have you given advice to Commanders or been consulted
13 on issues regarding Administrative Segregation?
14   A.   Well in my last four years, almost on a daily
15 basis.
16   Q.   In this particular case, is Private Armann in Admin
17 Segregation?
18   A.   Yes, sir, he is.
19   Q.   Could you tell the court whether or not that that
20 decision was made in order to punish --
21        MILITARY JUDGE: Before we get there, Major
22 Meredeth, let me interrupt you for just one second.
23        Can you tell me what "Administrative Segregation" is,
24 Master Sergeant Perez?
25        WITNESS: Administrative Segregation is, sir, when

28

```
 1  we have a reason to believe that the inmate needs to, or the
 2  detainee, needs to be segregated from the population either
 3  because they feel threatened, or because they threatened
 4  somebody else, either homosexual behavior, or medical
 5  observations.
 6           MILITARY JUDGE:  Thank you, Master Sergeant Perez.
 7           You can proceed.
 8      Q.   (By Maj Meredeth)  Was Private Armann placed in
 9  Admin Segregation in order to punish him for the --
10           DEFENSE COUNSEL:  Objection, Your Honor.
11           MILITARY JUDGE:  Basis?
12           DEFENSE COUNSEL:  He did not make that decision.
13  So it calls for speculation.
14           MILITARY JUDGE:  Why did you recommend Private
15  Armann be placed in Administrative Segregation?
16           WITNESS:  We received information from a CID
17  Investigator that the detainee was able to manufacture
18  weapons and poisons, and that other conspirators to this
19  case were going to be incarcerated at a later time.
20           MILITARY JUDGE:  Please proceed, Major Meredeth.
21      Q.   (By Maj Meredeth)  Can you describe the difference
22  between the pretrial detainees who are in Admin Segregation
23  and the other pretrial detainees as to their living
24  conditions?
25      A.   The other detainees live in an open bay.  Detainee
```

1  Armann lives in a cell, 5 x 8 x 8, approximately 32 square
2  feet.
3          Basically, the only difference is the sleeping
4  accommodations during the nighttime. During the day, he's
5  able to work, go to recreation, go to the dining facility,
6  see movies, just like any other detainee.
7     Q.  Is his food any different from any of the other
8  pretrial detainees?
9     A.  No, sir. He goes down to the dining facility just
10 like any other detainee.
11    Q.  Is his work the same?
12    A.  Yes, sir.
13    Q.  About how many hours a day do they labor?
14    A.  Well being a detainee, we have to maintain them
15 segregated from the main population or the post-trial
16 inmates. So it's a very minimum amount of work that they
17 can do. They are assigned right now to, I believe, the
18 cleaning of the central control point; that is their detail.
19 So as soon as they finish with that, maybe it takes about an
20 hour to complete that work and then they can work in the
21 segregation area cleaning or doing whatever needs to be done
22 there.
23    Q.  As far as recreation goes, is Private Armann
24 allowed to watch TV and read books and, if so, how much
25 opportunity does he have for these things?

30

1   A.   During recreation, we have a schedule of calls
2 which on certain days he gets one hour of Library, and then
3 two hours of Gym with the other detainees. Sometimes, or
4 some days, he gets one hour in the Gym, but they always do
5 get one hour in the Library -- and that's everyday.
6   Q.   Can you explain in more detail what your reasons
7 were for recommending to the Commander, Major Lynch, that
8 Private Armann be placed in Admin Segregation?
9   A.   Well we have a responsibility to protect other
10 detainees, inmates and staff that work in the Confinement
11 Facility. Once we had the knowledge that Detainee Armann
12 can manufacture weapons and poisons, then we had to do
13 something to the fact of protecting others, to include
14 Detainee Lund at the time who was also involved with the
15 case. And it was informed to us that Lund was going to
16 testify against Armann. So thinking of those issues and
17 those things that were discussed, we decided that we had to
18 protect either Lund or any other Cadre that work in the
19 facility.
20   Q.   Now, in the Admin Segregation area, is there more
21 supervision from guards?
22   A.   Yes, sir, there is. There's a 24-hour supervision
23 there. There's two guards there, one of them which is a
24 NCO, who supervise very closely the detainees.
25   Q.   Was there any medical reasons that also may have

31

1  made it beneficial to have Private Armann in Admin
2  Segregation?
3      A.   Since he arrived, he's been under medical
4  observation on and off due to migraine headaches.
5           He's currently taking medication.
6           He's allowed to wear dark sunglasses due to
7  migraines.
8           He's been transported to the hospital a few times
9  with complaints from migraine headaches.
10          Once, like I said before, and they may consider it
11 a medical observation, he plays in the segregation area, or
12 stays in the Administrative Segregation Area, then he can be
13 closely observed by the Cadre personnel.
14     Q.   And that's for the safety of the inmate; correct?
15     A.   That is correct, sir.
16     Q.   Wasn't there in fact one episode where Private
17 Armann passed out, or had some problem with his medications
18 and the guards had to help him?
19     A.   I believe so.
20          I don't recall exactly that case, but I believe he
21 did, sir.
22          TRIAL COUNSEL:  No further questions, Your Honor.
23          MILITARY JUDGE:  Major DePeppe?
24          DEFENSE COUNSEL:  Thank you, Your Honor.

```
 1   after he arrived.
 2       A.  Well, it was brought to our attention as soon as he
 3   got the -- what should I say -- within 24 hours, all the
 4   inmates are medically evaluated by the doctor.  Then all
 5   those issues -- the medications that they use, have been
 6   evaluated at that moment to see if they may, or the detainee
 7   may or can continue using those medications, or has got a
 8   medical problem that we need to be aware of.
 9       Q.  But he didn't have any kind of a medical problem of
10   passing out, as the trial counsel asked you, for quite some
11   period after his initial arrival; right?
12       A.  Prior to his arrival, I don't have any knowledge of
13   that, sir.  But he was already on medication and he was, he
14   brought to our attention that he needed to use sunglasses
15   during the daytime.
16       Q.  But you didn't know that he, when you first put him
17   in Administrative Segregation, you didn't know that he would
18   pass out on the ground, or have some kind of a problem?
19       A.  I didn't have no knowledge of that, sir.
20       Q.  When the decision was made to put Private Armann
21   and Specialist Lund in pretrial- I'm sorry- in
22   Administrative Segregation, that came after a meeting that
23   was held in the Commander's Office; right?
24       A.  That's correct, sir.
25       Q.  And you were at that meeting?
```

1  are distinct from those that gave rise to AE II and III.
2           As such, the court orders an inquiry into the
3  mental responsibility of the accused under the provisions of
4  RCM 706.  Its order is contained in what has been marked as
5  Appellate Exhibit IX.
6           The counsel are urged to take a look at the
7  deadlines that I've set for the conduct of this Board.
8           I would like the Board's findings to be made
9  available to the parties in this case in accordance with the
10  RCM no later than close of business on 9 February 1999.  And
11  any difficulty in meeting that requirement is going to be
12  brought to your attention by the Med folks, Major Meredeth.
13  So they're going to call you when they read this order.
14           I am the person who authorizes their delays and
15  such, so please check with me when they call and start
16  whining that they can't get it done by 9 February 1999.
17           I defer ruling on your motion as contained in AE I
18  until we receive the results of the inquiry under RCM 706,
19  Major DePeppe.
20           We'll take up any additional matters on your motion
21  for appropriate relief concerning violation of Article 13
22  and the maximum punishment in this case next Monday,
23  February 1st, here in Mannheim at 0900 hours.
24           Is there anything further before the court
25  recesses?

1  Q. Is part of what you do to try to discover the motivations
2  which lead criminals to commit the crime?
3  A. In an evaluation, let's say a pre-sentencing evaluation, there
4  are a number of questions I'd like to ask in my evaluation. Two of
5  the principle questions are: why you, and why now?
6  I like to understand what is it about a particular defendant
7  that caused him to act in the way he did at the time that he did;
8  what were the stressors that he was under, what is it about his
9  developmental history that came to play out in this way and why he
10 did this thing at this time.
11 Q. What have you done to become familiar with this case?
12 A. I've reviewed, I guess, charge sheets, CID records, witness
13 statements, evaluated the defendant for about 6 hours, I guess, 2
14 days ago. Probably another hour yesterday. Interspersed, I've had a
15 few more questions here and there.
16 I spoke to his mother on the phone and interviewed her for
17 about an hour. I interviewed PFC Bell for about 2 and a half hours
18 yesterday.
19 I've sat in the courtroom all day listening to the testimony.
20 I've had pre-trial conferences with both the trial counsel and the
21 defense counsel.
22 Q. What tests or evaluative techniques have you used with Private
23 Armann?
24 A. I don't know if it's so much a test.