1    ACC:   I would say, approximately, at the end of March the
2    agreement was pretty much set in stone.

3    MJ:   And that's March of 1998.

4    ACC:   Yes, sir.

5    MJ:   Now, you've pled guilty to doing a number of things to bring
6    that killing about, that killing of Private Bell.   Among them are:
7    preparing a poison, building and testing a firearm, borrowing a car,
8    driving to a site near the main gate of Fliegerhorst Kaserne, and,
9    eventually, shooting Private Bell with a firearm.

10       Let's take a look at each of those in turn.

11       Tell me about preparing a poison.   Was this part of you
12   agreement with Lund to kill Bell?

13   ACC:   Yes, sir.

14       I got numerous types of information from Lund because he had
15   access to the Internet and we would sit and discuss it, and the
16   poison was something that we had both looked at and decided it was
17   possibly a means to do that.

18   MJ:   How did you obtain the materials to make the poison or to get
19   a hold of the poison?

20   ACC:   From local stores such as the PX.

21   MJ:   Did you buy it or did Lund buy the materials?

22   ACC:   I did, sir.

23   MJ:   What did you do with these materials?

1    ACC:  I put them together in such a way that they would be
2   considered poison according to the directions that we obtained from
3   the Internet.

4    MJ:  What did you do with the materials once you had made them
5   poisonous?

6    ACC:  Actually I kept them in my top drawer.

7    MJ:  Was that in your barracks room?

8    ACC:  Yes, sir.

9    MJ:  What was the plan?

10       How did you intend to use these poisons?

11   ACC:  By putting them in something that she drank or something
12   that she ate.

13   MJ:  Did you ever get a chance to do that?

14   ACC:  Yes, sir.

15   MJ:  Tell me about that circumstance.

16   ACC:  I had just about any chance in the world.  I could have done
17   it at any time because I worked with her. There were many times that
18   I was at her house. But I didn't do that.

19   MJ:  Did you ever have the poisons with you while you were at her
20   house?

21   ACC:  Yes, sir.

22   MJ:  Did you ever have access to the poisons while you two were at
23   work?

24   ACC:  Yes, sir.

1    MJ:  And these were the type of things that you could put in her

2  coffee or even inject it into her, if you were so inclined, right?

3    ACC:  Yes, sir.

4    MJ:  For one reason or another, you didn't go with the poison

5  option though, right?

6      You guys decided to try something else.

7    ACC:  Yes, sir.

8    MJ:  Was it at that point that you decided to build and test a

9  firearm?

10    ACC:  Yes, sir.

11    MJ:  Could you tell me about that, please?

12    ACC:  I had access to the SPAMs where the unit welder had access

13  to materials and things of that nature, and by gaining access to that

14  I was able to construct a firearm.

15    MJ:  Who is the unit welder?

16    ACC:  Specialist Tarbox, sir.

17    MJ:  Let me back up a little bit.

18      When you had agreed to kill Private Bell with Lund, did you

19  guys decide on any particular way or was that something you were

20  going to explore and work together on?

21    ACC:  We explored it, sir.

22    MJ:  So the poison was part of that agreement, looking for a way

23  to make the murder of Bell happen?

24    ACC:  Yes, sir.

25    MJ:  Okay.

1       But we moved beyond the poison and we decide to go with a
2   firearm.

3       Is Lund in on the decision to shift gears, if you will, and
4   build a firearm to kill Private Bell?

5   ACC:  Yes, sir.

6   MJ:  How do you make contact with Tarbox at that point?

7   ACC:  I approach him at work, and talk to him, tell him that I
8   need him to do something for me and he agreed to do that.

9   MJ:  You told Tarbox, though, that you were building a firearm,
10  right?

11  ACC:  Yes, sir.

12  MJ:  What happened then; did Tarbox make a firearm with you?

13  ACC:  There was a lapse of time in between, sir, where we talked
14  about it, and explored different caliber's, and sizes. And then we
15  went ahead and constructed the firearm.

16  MJ:  Now, which firearm was that?

17      The stipulation of fact mentions a few different efforts at
18  firearms.

19      Is this the 25 caliber?

20  ACC:  Yes, sir.

21  MJ:  What happened with that firearm?

22  ACC:  It didn't operate correctly, sir.

23  MJ:  And you knew that because you had tested the weapon at some
24  point.

25  ACC:  Yes, sir.

1    MJ:  What did you do then?

2    ACC:  I changed calibers and changed measurements on the breech

3    and the barrel to prevent the weapon from backfiring again.

4    MJ:  How did you decide, or gather the information you needed, to

5    improve the weapon?

6        Was this stuff from the Internet too, or was this from books,

7    or information that you already possessed?

8    ACC:  It was from an Army manual, sir.

9    MJ:  Did you actually make the drawing in Prosecution Exhibit 1 of

10   what the firearm was going to look like?

11   ACC:  Yes, sir.

12   MJ:  I'm referring to [looking through PE 1] the page marked 1-12,

13   in Prosecution Exhibit 1.

14       [Holding up PE 1.]  Is that your drawing?

15   ACC:  [Viewing PE 1.]  Yes, sir.

16   MJ:  Did Tarbox build that weapon for you or did you work with him

17   on building that?

18   ACC:  I worked with him, sir.

19   MJ:  Did Lund know that you were building an improved firearm with

20   Tarbox?

21   ACC:  Yes, he did, sir.

22   MJ:  What did Lund think about using a firearm to kill Bell; did

23   you guys ever talk about it?

24   ACC:  Yes, we did, sir.

1 MJ: Did he think it was a good idea, give you a thumbs up, to
2 proceed that way?

3 ACC: Yes, he did, sir.

4 MJ: Now, once the firearm that we're talking about had been
5 finished, did you then go test it?

6 ACC: Yes, sir.

7 MJ: Where did you test it?

8 ACC: Near the Alzenau area, past the Wolfgang shopping center,
9 out in the middle of nowhere, basically.

10 MJ: Where did you get the rounds to test it?

11 ACC: From an acquaintance, and actually a friend, of Jeremy Lund,
12 Mr. Mike Sehr.

13 MJ: Was he from the Rod and Gun Club or somewhere that had access
14 to live ammunition?

15 ACC: He just had access to live ammunition I believe, because he
16 was also a soldier, a German soldier.

17 MJ: What caliber was the ammunition that you obtained?

18 ACC: 223, sir.

19 MJ: Now, is that standard military specification ammo or is this
20 commercial 223 ammo?

21 ACC: There was a mix of ammunition, sir. I had access to the
22 military conventional full metal jacket rounds and the 223 Remington
23 rounds.

24 MJ: Once you got the rounds did you then test the firearm?

25 ACC: Yes, sir.

1   MJ:  How did you do that?

2    ACC:  I took the firearm and propped it up, secured it in a manner

3   that would keep it from moving after it was fired.  I attached a

4   piece of dental floss to the trigger because it had backfired once,

5   and I moved to a position approximately 20 feet away from the

6   firearm, aimed it at a secure backstop, and fired, sir.

7    MJ:  Did it work that time?

8    ACC:  Yes, sir.

9    MJ:  What kind of targets did you use to test the accuracy of the

10   weapon?

11    ACC:  Water-bottles, signs, there was numerous different things

12   that we used.

13    MJ:  The stipulation of fact mentions testing the weapon using a

14   melon that you had purchased.

15     Can you tell me a little bit about that?

16    ACC:  Yes, sir.

17     The night of the incident I tested the weapon one more time

18   using a melon propped up on a stick.

19    MJ:  And you choose a melon for what reason?

20    ACC:  Because when I was growing up, I had fired different weapons

21   at fruit when I was growing up.  So it was just something that came

22   second nature, sir.

23    MJ:  Were you able to hit the melon with the weapon?

24    ACC:  Yes, sir.

1    MJ:  And you were testing the functioning and accuracy of this

2    weapon that you built in order to use it against Private Bell,

3    correct?

4    ACC:  That is correct, sir.

5    MJ:  Now, after you had tested the functioning and accuracy of the

6    weapon, what did you do then?

7    ACC:  That's when the incident was getting ready to take place.

8    MJ:  Tell me about borrowing the car, if you would.

9    ACC:  Yes, sir.

10       That night we borrowed the car from Specialist Hager to have

11   access to the commissary to purchase the melon, to be able drive to

12   get the extra rounds that we needed, and to actually commit the act.

13   MJ:  Did you get the extra rounds and buy the melon in accordance

14   with your plan; everything went as you intended?

15   ACC:  I wouldn't say that it was I intended, sir, but it just----

16   MJ:  But you got the car?

17   ACC:  Yes, sir.

18   MJ:  Okay.

19       And you went to the commissary?

20   ACC:  Yes, sir.

21   MJ:  Okay.

22       Tell me about how you got the extra rounds that night.

23   ACC:  I went to Mr. Sehr's house and asked him if he had any extra

24   rounds that I could get from him and he said, "Yes."  And that's how

25   I obtained the rounds.

104

1  MJ:  What was your estimate of the ballistics of your firearm; did
2  they produce muzzle velocities and energy comparable to a standard
3  223 round? Or was it something more or less?
4  ACC:  I really don't know enough about the ballistics of that
5  weapon, sir, to be able to answer that question accurately.
6  MJ:  And your belief that it could possibly be fatal to another
7  individual is one of the reasons you took that with you and used it
8  against Private Bell that night?
9  ACC:  That is correct, sir.
10  MJ:  You borrowed a car, you bought melons, you obtained extra
11  rounds.
12      Who's with you at this point?
13  ACC:  Jeremy Lund, sir.
14  MJ:  Who's driving; who's riding?
15      What's the arrangement at that time?
16  ACC:  At that time, I'm driving, sir.
17  MJ:  What's Lund doing while you're testing the weapon, and
18  obtaining melons, and stuff like that?
19  ACC:  He's basically at my side the entire time.  When we fired at
20  the melon there wasn't a lot of light, so he actually shined a light
21  on the melon so I could see what I was doing.
22  MJ:  He knew what you were doing.
23  ACC:  Oh, definitely, sir.
24  MJ:  What happened after you were through testing the weapon?
25      Where did you and Lund go?

105

1    ACC:  We returned back to the barracks, sir, so I could change my
2    clothes.

3    MJ:  What kind of clothes did you put on?

4    ACC:  A pair of black jeans, a black T-shirt, and a pair of combat
5    boots, sir.

6    MJ:  And what time of day is this?

7    ACC:  It would have been approximately 2200 hours, sir, 2300
8    hours.

9    MJ:  It was dark or getting dark at that time?

10    ACC:  It was very dark, sir.

11    MJ:  Why did you wear the black clothing?

12    ACC:  So I wouldn't be seen, sir.

13    MJ:  What did you do after you changed into the black clothing?

14    ACC:  That's where Lund began to drive, and we went to the sight
15    where we were going to park the car at, sir.

16    MJ:  Where did you park the car?

17    ACC:  At a small parking area that's located outside the post at
18    Fliegerhorst, off of the road.

19    MJ:  And why did you park there?

20    ACC:  Because it appeared to be a secluded spot where nobody else
21    was sitting and it was easy to access the area where I was going to
22    shoot from, sir.

23    MJ:  How did you pick the area you were going to shoot from?

24    ACC:  It was more or less random, sir.

106

1    MJ:  How did you know Bell was going to be visible from the point
2    you were going to shoot from?

3    ACC:  Because all the guards rotated in that manner.  There was
4    always somebody up there to do ID check.  I didn't know exactly when
5    she was going to be there, it was actually luck, sir.

6    MJ:  But once you got there, at this location, how far or how
7    close were you to the gate itself?

8    ACC:  Probably about 30 yards, sir.

9    MJ:  Did you go to that point after Lund parked the car?

10    ACC:  Yes, sir.

11    MJ:  Where was Lund now?

12    ACC:  Lund stayed in the car, sir.

13    MJ:  Did you tell him where you were going; did he know where you
14    were going?

15    ACC:  Yes, sir.

16    MJ:  What did you take with you when you left the car?

17    ACC:  I took the rifle, sir.

18    MJ:  Any ammunition?

19    ACC:  Yes, sir.

20    Just one round that was in my pocket and the one round that was
21    in the chamber, sir.

22    MJ:  Was Bell on guard duty when you got to the point you had
23    picked to shoot from?

24    ACC:  No, she wasn't, sir.

25    MJ:  What did you do then?

1    ACC:  I waited about 15 to 20 minutes, sir.

2    MJ:  What happened then?

3    ACC:  She came out on guard duty, sir, to that point.  Then at

4    that point I sighted in and fired, sir.

5    MJ:  What kind of sight did you have on the rifle?

6    ACC:  It was a BB gun scope, sir.

7    MJ:  Did it have cross-hairs in it?

8    ACC:  Yes, sir.

9    MJ:  It magnified, some degree, what you were seeing?

10   ACC:  Very slight, sir, yes.

11   MJ:  From the time she came on guard duty to the time you sighted

12   in on her with the rifle, how much time passed?

13   ACC:  Probably about 2 minutes, sir.

14   MJ:  What happened after you sighted in on her?

15   ACC:  I closed my eyes and fired, sir.

16   MJ:  What part of her body did you sight on?

17   ACC:  I shot for the head, sir.

18   MJ:  Her head was visible in the telescopic sight?

19   ACC:  Actually, almost her whole body was visible in the scope,

20   sir.

21   MJ:  And what part of the body did you place under the cross-hairs

22   of the scope, or whatever sight device was in the scope?

23   ACC:  I believe it was the head, sir.

24   MJ:  You didn't close your eyes to throw the shoot off or just to

25   shoot at random, you shut your eyes for a specific purpose?

108

1    ACC:  Fear, sir.

2    MJ:  But you did pull the trigger.

3    ACC:  Yes, sir.

4    MJ:  What did you observe, if anything, after you shot?

5    ACC:  I heard her scream, sir, and that's all that I saw.  I began

6    to run after that, sir.

7    MJ:  So you admit that at or near Hanau, Germany, between on or

8    about 1 March 1998, and on or about 10 November [sic] 1998, you

9    entered into an agreement with, then Specialist, Jeremy J. Lund to

10   commit an offense under The Code; that is, the premeditated murder of

11   Private First Class Toni Bell.

12   ACC:  Yes, sir.

13   MJ:  And you also admit that while the agreement continued to

14   exist and while you remained a party to this agreement you borrowed a

15   car and drove or rode in it to a site near the main gate of

16   Fliegerhorst Kaserne.

17   ACC:  Yes, sir.

18   MJ:  And, finally, that while this agreement continued to exist

19   and while you remained a party to the agreement you did shoot Private

20   First Class Bell with that firearm.

21   ACC:  Yes, sir.

22   MJ:  And you did these acts; that is, preparing a poison, building

23   and testing a firearm, borrowing the car, driving it to a site near

24   the main gate of Fliegerhorst Kaserne, and shooting Private Bell with

1  the firearm for the purpose of bringing out the object of the

2  agreement; that is, to kill Private Bell.

3  ACC:  That's correct, sir.

4  MJ:  Do counsel for either side believe further inquiry is

5  necessary as to The Specification of Charge II?

6  Trial?

7  ATC:  No, Your Honor.

8  MJ:  Defense?

9  DC:  No, Your Honor.

10  MJ:  Now, let's shift gears a little bit and focus more closely on

11  The Specification of Charge I.

12  Here we're looking just at the shooting.  We're near the gate

13  to Fliegerhorst Kaserne on or about 10 October 1998.

14  What was your intent when you sighted on Private Bell as she

15  stood guard duty at the gate to Fliegerhorst Kaserne that evening?

16  ACC:  To kill her, sir.

17  MJ:  This is going to sound weird, but you didn't think that as a

18  result of your contract dispute with her, the financial dispute, that

19  you had a right to kill her, or an excuse to kill her, at that point?

20  ACC:  No, sir.

21  MJ:  You mentioned that you had been at the gate....

22  Well, let's back up even further.

23  From March to October of 1998, you would agree that you had

24  considered bringing about Private Bell's death.

25  ACC:  That is correct, sir.

1    MJ:  How many times do you think you considered, considered like

2  think, ponder, wonder about, envision killing her?

3        How much time had you spent on this?

4    ACC:  A lot of time, sir.

5    MJ:  More than a day; can you give a best guestimate.

6    ACC:   Months, sir.

7    MJ:  How much time elapsed between when you made the firearm with

8  Tarbox that you ultimately used to shoot Private Bell, and the time

9  you actually shot?

10    ACC:  I would say, probably, about 5 days, sir.

11    MJ:  Did you have the weapon in your possession during that 5

12  days?

13    ACC:  Yes, I did, sir.

14    MJ:  And how much time elapsed between when you got the ammunition

15  to shoot Private Bell on or about 10 October 1998, 9 or 10 October,

16  and when you actually shot her?

17    ACC:  Probably about an hour and a half to 2 hours, sir.

18    MJ:  So you admit that you shot Private First Class Toni A. Bell

19  with a firearm.

20    ACC:  Yes, sir.

21    MJ:  Do you admit that you did so on or about 10 October 1998?

22    ACC:  That is correct, sir.

23    MJ:  At or near Hanau, Germany?

24    ACC:  Yes, sir.

1    MJ:   And you also admit that you shot Private First Class Toni A.

2  Bell with the specific intent to kill her; that is, to kill without

3  justification or excuse?

4    ACC:   Yes, sir.

5    MJ:   And you admit that such acts amounted to more than mere

6  preparation; that is, that they were a substantial step in direct

7  movement toward the unlawful killing of Private Bell?

8    ACC:   Yes, sir.

9    MJ:   And you also admit that this act apparently tended to bring

10  about the commission of the offense of premeditated murder; that is,

11  that the act would have apparently resulted in the actual commission

12  of the offense of premeditated murder?

13    ACC:   Yes, sir.

14    MJ:   But for her survival?

15    ACC:   Yes, sir.

16    MJ:   And you admit that at the time that you shot Private Bell

17  with the firearm you had the premeditated design to kill Private

18  Bell?

19    ACC:   Yes, sir.

20    MJ:   Do counsel for either side believe further inquiry is

21  necessary as to The Specification Of Charge I?

22      Trial?

23    ATC:   No, Your Honor.

24    MJ:   Defense?

25    DC:   No, Your Honor.

1    MJ:   Okay.

2        Let's shift gears and look at The Specification of Charge III,

3    alleging a violation of Article 92.

4        Specifically, you've pled guilty to two regulatory violations

5    in this charge.

6        One is possessing a silencer, and two is possessing a firearm

7    that was not registered in accordance with USAREUR Regulation 190-6,

8    within 3 workdays of acquisition.

9        Tell me about this silencer.

10       Where did you get it from?

11   ACC:   It was manufactured, sir.

12   MJ:   When you say, "it was manufactured," is it something you

13   bought from somebody or did you make it yourself?

14   ACC:   I made it myself, sir.

15   MJ:   Did you have a chance to test it?

16   ACC:   When it was tested with the firearm, yes, sir.

17   MJ:   Did it silence or muffle the report of the weapon?

18   ACC:   Yes, it did, sir.

19   MJ:   Is there any doubt in your mind that it was, in fact, a

20   silencer or muffler for a weapon as described in USAREUR Regulation

21   600-1?

22   ACC:   No, sir.

23   MJ:   Now, this firearm, that you constructed with the aid of

24   Private Tarbox, it was a weapon from which a shot is discharged by an

1  explosive, the round from the 223 cartridge, that you placed in it,

2  correct?

3     ACC:  That's correct, sir.

4     MJ:  And you admit that it was for that reason a "firearm"?

5     ACC:  Yes, sir.

6     MJ:  You didn't report your manufacture of that weapon to the

7  USAREUR weapons registration folks, did you?

8     ACC:  No, I didn't, sir.

9     MJ:  And that was because you wanted to use it to effect your plan

10  with Specialist Lund, correct?

11     ACC:  Correct, sir.

12     MJ:  So you didn't register it according to USAREUR regulations

13  within 3 workdays of its acquisition?

14     ACC:  Yes, sir.

15     MJ:  Yes, you did, or, yes, you didn't register it?

16     ACC:  Yes, I did not, sir.

17     MJ:  Okay.

18       If I told you that possession means the care, custody,

19  management, and control of something, would you agree that you

20  possessed the silencer that you manufactured?

21     ACC:  Yes, I did, sir.

22     MJ:  And you admit that you possessed a firearm that wasn't

23  registered according to USAREUR regulations within 3 days of its

24  acquisition?

25     ACC:  Yes, sir.

1    MJ:  Major DePeppe, you have no challenge to the existence of a
2    certain lawful general regulation as alleged in The Specification of
3    Charge III, do you?

4    DC:  No challenge, Your Honor.

5    MJ:  You believe it was a properly promulgated regulation and
6    filed with the appropriate authorities at the time of this offense?

7    DC:  Yes, Your Honor.

8    MJ:  Do you admit, Private Armann, that Alpha Company of 127th ASB
9    is part of USAREUR, right, the United States Army in Europe?

10    ACC:  Yes, sir.

11    MJ:  Private Armann, so you admit that there was in existence a
12    lawful general regulation in the following terms; that is,
13    prohibiting the possession of a silencer or muffler for a firearm and
14    a firearm that was not registered in accordance with USAREUR
15    regulation within 3 workdays of acquisition, right?

16    ACC:  Yes, sir.

17    MJ:  And you admit that you had a duty to obey such regulation?

18    ACC:  Yes, I did, sir.

19    MJ:  And that on or about 10 October 1998, at or near Hanau,
20    Germany, you violated this lawful regulation by wrongfully possessing
21    a silencer and a firearm that was not registered in accordance with
22    USAREUR regulation within 3 workdays of acquisition?

23    ACC:  Yes, sir.

24    MJ:  Do counsel for either side believe any further inquiry is
5    necessary as to The Specification of Charge III and Charge III?

115

1       Trial?

2    ATC:  No, Your Honor.

3    MJ:  Defense?

4    DC:  No, Your Honor.

5    MJ:  All right.  We're on the home stretch, Private Armann.

6       Turn to The Specification in Charge IV.

7       After the shooting, you used marijuana at some point.

8    ACC:  Yes, I did, sir.

9    MJ:  Can you tell me about how that happened?

10   ACC:  Yes, sir.

11      After the shooting, I returned to the barracks, 1326, and I

12   went upstairs and discussed some things with Private Lund and I

13   smoked marijuana while I was doing that.

14   MJ:  How did you know it was marijuana?

15   ACC:  Because I know what it looks like, sir, and I know what it

16   smells like, sir.

17   MJ:  And you knew what it looked like and smelled like because you

18   had previously seen or smelled marijuana, prior to this evening?

19   ACC:  Yes, sir.

20   MJ:  And you know marijuana is against the law, right?  To possess

21   or use.

22   ACC:  Yes, I do, sir.

23   MJ:  You didn't think you were, at that point, working for CID or

24   using the marijuana with medical authority or anything like that, did

25   you?

1   ACC:  No, I did not, sir.

2   MJ:  How did you ingest the marijuana?

3   ACC:  I smoked it, sir.

4   MJ:  Was it from a pipe or out of a joint?

5   ACC:  It was from a pipe, sir.

6   MJ:  Did you load the pipe or did someone else load the pipe?

7   ACC:  I loaded the pipe, sir.

8   MJ:  So you had a chance to see what it was that you were putting

9   in the pipe?

10   ACC:  Yes, sir.

11   MJ:  What effects, if any, did you have from smoking the

12   marijuana?

13   ACC:  A sedating effect, sir.

14   MJ:  That was consistent with your understanding of what happens

15   when you smoke marijuana?

16   ACC:  Yes, it is, sir.

17   MJ:  So you admit that on or about 11 October 1998, at or near

18   Hanau, Germany, you used marijuana, a schedule one controlled

19   substance?

20   ACC:  Yes, sir.

21   MJ:  And you actually knew that you were using the substance?

22   ACC:  Yes, I did, sir.

23   MJ:  And you actually knew that the substance that you were using

24   was marijuana or of a contraband nature?

25   ACC:  Yes, sir.

1    MJ:  And, finally, you knew that the use was wrongful?

2    ACC:  Yes, I did, sir.

3    MJ:  Do counsel for either side believe any further inquiry is

4    required as to The Specification of Charge IV?

5    ATC:  No, Your Honor.

6    DC:  No, Your Honor.

7    MJ:  Major DePeppe, do you have any additional motions to make in

8    connection with the maximum punishment in this case?

9    DC:  Your Honor, for the purposes of sentencing, we believe that

10   Charge I and Charge II should be considered one offense, and that

11   this was one ongoing plan which ultimately occurred.  For that reason

12   it should be consolidated into one specification of violation of the

13   Article of conspiracy to commit murder.

14   MJ:  I'll hear from the government on this matter.

15   TC:  Yes, Your Honor.

16        Conspiracy and attempted murder are separate offenses under the

17   UCMJ.  Under Article 81, The Manual specifically states that they are

18   separately punishable.  It says under Article 81, c-8, [reading from

19   the MCM] "Conspiracy as a separate offense."  Conspiracy to commit an

20   offense is a separate and distinct offense from the offense which is

21   the object of the conspiracy.  Both the conspiracy and the

22   consummated offense which was its object may be charged, tried, and

23   punished.  The commission of the intended offense may also constitute

24   the overt act which is an element of the conspiracy to commit that

25   offense.

1    MJ:  It's hard for the court to get around the President's

2    unambiguous guidance on that one, Major DePeppe.

3        What do say in response to the government?

4    DC:  Well, the President's guide's there, generally, to address

5    the multiplicity issue and, though we're not saying in a technical

6    sense that the two are not separate for multilplicious purposes, but

7    nevertheless, notions of fairness would indicate that this was an

8    ongoing plan to commit an offense, ongoing course of conduct which

9    culminated, and when looked at in that context we can separate out a

10   lot of different things.  We can even separate out, technically, the

11   conspiracy as duplicitous, because there's multiple things that are

12   charged as overt acts, so I think it needs to be looked on as one

13   ongoing course of conduct, which was culminated.

14   MJ:  What effect on the maximum punishment do you believe that my

15   granting of your motion would have, Major DePeppe?

16   DC:  I believe it would no longer be life without possibility --

17   Life without the possibility of parole would no longer be the

18   maximum, Your Honor.

19   MJ:  And why do you think that would be?

20   DC:  Just reading the maximum punishment afforded to conspiracy,

21   Your Honor.

22   MJ:  Your motion to reduce the maximum sentence is denied, Major

23   DePeppe.

24       Private Armann, I've just denied your defense counsel's motion

25   to reduce the maximum sentence.  If I had granted the motion it may

119

1  have reduced the maximum confinement that you are facing from life

2  imprisonment without the possibility of parole to life imprisonment.

3  Now, at some later time, another court may decide that my ruling was

4  incorrect.  If so that would mean that you should have only been

5  facing confinement for life at this court-martial.

6      Now, whether my ruling is correct or incorrect, and whether you

7  would be facing life without parole or life, do you still want to

8  plead guilty?

9      ACC:  Yes, I do, sir.

10     MJ:  So even if you were only facing life, you would still want to

11 plead guilty?

12     ACC:  Yes, sir.

13     MJ:  Trial counsel, do you intend to argue for a fine in this

14 case?

15     ATC:  No, Your Honor.

16     MJ:  The court rules that a fine is not appropriate in this case,

17 and one may not be adjudged.

18     Private Armann, based on your plea of guilty alone you could

19 lawfully be sentenced to the maximum punishment authorized.  In this

20 case the maximum punishment for the offenses to which you have pled

21 guilty are as follows:  a dishonorable discharge, confinement for

22 life without parole, reduction to the lowest enlisted grade, total

23 forfeiture of pay and allowances.

24     Do you have any questions as to the sentence that could be

25 imposed as a result of your plea of guilty?

1    ACC:  No, sir.

2    MJ:  Trial, defense, do you agree with the court's statement of

3    the maximum sentence, reserving, of course, Major DePeppe, any issues

4    that have been raised by your motions?

5        Government?

6    ATC:  Yes, Your Honor.

7    MJ:  Defense?

8    DC:  Yes, Your Honor.

9    MJ:  The pre-trial agreement in this case has been marked as

10   Appellate Exhibit X.

11       Private Armann, do you have a copy of your offer to plead

12   guilty and the pre-trial agreement counter-offer to your offer to

13   plead guilty at the table?

14   ACC:  Yes, I do, sir.

15   MJ:  Now, since this is a judge alone case, I don't have a copy of

16   the quantum portion of the agreement before me.

17       Is there a quantum portion of this agreement marked as

18   Appellate Exhibit XI, trial?

19   ATC:  Yes, Your Honor, there is.

20   MJ:  Okay.

21       Private Armann, do you have a copy of the quantum portion at

22   your table?

23   ACC:  Yes, I do, sir.

24   MJ:  Did you sign both these documents?

25   ACC:  Yes, I did, sir.

1    MJ:   Did you read both of them before you signed them?

2    ACC:  Yes, I did, sir.

3    MJ:   Did you discuss both of them with your defense counsel before

4    you signed them?

5    ACC:  Yes, I did, sir.

6    MJ:   Now, when you make a pre-trial agreement with the convening

7    authority usually what happens is you agree to plead guilty and he

8    agrees to do something for you in return.  Usually he agrees to set a

9    limit on the sentence that he will approve.  What that means is

10   regardless of the sentence that you receive from this court the

11   convening authority may not approve a sentence greater than the one

12   contained in your agreement, if you comply with the terms and

13   conditions contained in your offer to plead guilty.

14       Do you have any questions about what a pre-trial agreement is?

15   ACC:  No, I do not, sir.

16   MJ:   Now, let's look at the offer portion to plead guilty and go

17   over its provisions.

18       In paragraph 1, you offer to plead guilty.  Just as you have

19   done so today, through your counsel.  In paragraph 2-a, you agree to

20   enter into a written stipulation of fact.  You have done so.  In

21   paragraph 2-b, you state that you are satisfied with Major DePeppe

22   and Captain Howard's advice, and that this offer to plead guilty and

23   your pleas today are the product of their advice and your decisions,

24   and no one else is making any attempt to force or coerce you into

25   pleading guilty today and offering to plead guilty to the convening

122

1  authority.  And, finally, in 2-c, it's what we talked about already,

2  you agreed to have this case tried by me as the military judge and

3  waive your rights to have any panel hear your case today.

4      Do you understand all that in paragraph 2?

5  ACC:  Yes, I do, sir.

6  MJ:  Now, on this counter-offer to offer to plead guilty pre-trial

7  agreement there's something described as paragraph 3-d added.  The

8  parties would agree that that is intended to read paragraph 2-d.

9      Trial?

10  ATC:  Yes, Your Honor.

11  MJ:  Defense?

12  DC:  Yes, Your Honor.

13  MJ:  There General Hendrix proposes to you that you will agree to

14  cooperate with the prosecution of Specialist Roeseler, Specialist

15  Hager, Private Oie, and Private Gibson, and any other cases related

16  to the shooting of Private Bell on 10 October '98, and, if necessary,

17  to testify as a witness for the prosecution either at a court-martial

18  or at a prosecution by German authorities.

19      Do you agree that's part of what you've agreed to do here

20  today?

21  ACC:  Yes, it is, sir.

22  MJ:  Now, in paragraph 3 the government has agreed to do something

23  for you.  Dr. Keith Caruso has assisted you as a member of the

24  defense team and may testify as an expert.  And you have waived

25  production of any other overseas witnesses.  By "waive" you give up

1   any privilege that you may have had to have them produced here for

2   sentencing.

3       Do you understand those aspects of paragraph 3?

4   ACC:  Yes, sir.

5   MJ:  Paragraph 4 is an escape clause.  The government can bail out

6   if you fail to plea in accordance with this agreement, but you've

7   pled in accordance with the agreement, so they can't use this

8   provision to escape from the agreement and if I amend, consolidate,

9   or dismiss any of the charges against you, this agreement remains in

10   force.

11       Do you understand both of those aspects of paragraph 4?

12   ACC:  Yes, I do, sir.

13   MJ:  Paragraph 5 is your escape clause.  You can request to

14   withdraw your plea of guilty any time before I announce the sentence.

15   And if I permit you to do so, the agreement's off.  The agreement is

16   cancelled.

17       Do you understand that?

18   ACC:  Yes, I do, sir.

19   MJ:  Paragraph 6 is pretty straight forward.  This is your deal.

20   There is no other promises or understandings regarding your proposed

21   plea of guilty that aren't contained in this offer and the appendix.

22   ACC:  Yes, sir.

23   MJ:  Okay.

1    The bottom line is General Hendrix has agreed to place this

2  sentence limitation on any sentence that I impose in accordance with

3  appendix A of the offer to plead guilty, the quantum portion.

4    Do you understand that?

5    ACC:  Yes, I do, sir.

6    MJ:  Do you have any questions about any of the terms contained in

7  the agreement?

8    ACC:  No, I don't, sir.

9    MJ:  Is my interpretation of the pre-trial agreement, expressed

10  during trial, in open court, comport entirely with the understanding

11  of counsel for both sides and the accused?

12    Trial?

13    ATC:  Yes, it is, Your Honor.

14    MJ:  Major DePeppe?

15    DC:  Yes, Your Honor.

16    MJ:  Now, Private Armann, I don't know, at this stage of the

17  trial, what action the convening authority has agreed to take in

18  connection with your pre-trial agreement.  It's important however,

19  that you understand the deal that you and the convening authority

20  have agreed to.  So, at this time, go ahead and take the copy of your

21  agreement, turn to the quantum portion, and read to yourself, but

22  don't read it aloud whatever you do.

23  [The accused did as directed.]

24    MJ:  Do you have any questions about any of the terms contained in

25  the agreement?

1    ACC:  No, I don't, sir.

2    MJ:  Is that the action that the convening authority agreed to

3    take?

4         What I mean is, is that the deal that you thought you were

5    making with the convening authority.

6    ACC:  Yes, it is, sir.

7    MJ:  Did counsel for either side note any ambiguities in the offer

8    or quantum portion of the agreement?

9         Trial?

10   ATC:  No, sir.

11   MJ:  Defense?

12   DC:  No, Your Honor.

13   MJ:  Major DePeppe, at the RCM 802 conference, you inquired as to

14   whether or not I had seen the quantum portion of the pre-trial

15   agreement, which has been marked as Appellate Exhibit XI.

16        For the record, a packet containing a variety of documents was

17   delivered to me containing all previously marked exhibits.  Prior to

18   examining the exhibits, I asked the government to screen it and make

19   sure that the quantum was not in it.  They screened the packet and

20   removed the quantum portion from that packet prior to my review.  I

21   have not seen the quantum portion of this pre-trial agreement.  In

22   fact, I cannot see the quantum portion of this pre-trial agreement.

23        Does counsel for either side differ, or have any questions or

24   concerns about the court's description of what happened in the RCM

25   802 conference?

1    Trial?

2    ATC:  No, Your Honor.

3    MJ:  Major DePeppe?

4    DC:  No, Your Honor, and I just add that I was there, present.

5    Your having earlier mentioned that you gotten some matters faxed I

6    confused it and wondered if you had gotten it faxed when I realized

7    that the quantum and the packet that you had in front of you had just

8    been handed to you.  And I saw just what you described.  That you

9    handed it back to the government.

10    MJ:  Thank you for pointing out the fax incident too.  I'll record

11    that for the record.

12    I received both pages of what's been marked as Appellate

13    Exhibit X by fax at Wiesbaden, Germany, yesterday afternoon, but did

14    not receive a fax of the quantum portion.  Indeed, did not receive

15    many things I was expecting by fax yesterday from the government.

16    So, I have not seen the quantum portion.

17    Does counsel for either side wish to ask the military judge any

18    questions concerning this trial?

19    Trial?

20    ATC:  No, Your Honor.

21    MJ:  Defense?

22    DC:  No, Your Honor.

23    MJ:  Private Armann, has anyone made any promises to you that are

24    not written down in an attempt to get you to plead guilty?

25    ACC:  No, sir.

127

1    MJ:  So are all of the understandings, agreements, and promises

2    that you have in connection with this plea contained in Appellate

3    Exhibits X and XI?

4        ACC:  Yes, it is, sir.

5        MJ:  Trial, is that correct?

6        ATC:  Yes, Your Honor.

7        MJ:  Defense?

8        DC:  That's correct, Your Honor.

9        MJ:  Private Armann, are you pleading guilty not only to secure

10    the benefits of your pre-trial agreement, but because you feel in

11    your own mind that you're really guilty?

12        ACC:  Yes, I am, sir.

13        MJ:  Major DePeppe, have you, as defense counsel, had ample time

14    opportunity to discuss the agreement with the accused?

15        DC:  Yes, I have, Your Honor.

16        MJ:  Private Armann, have you had ample time and opportunity to

17    discuss this agreement with Major DePeppe and Captain Howard?

18        ACC:  Yes, I have, sir.

19        MJ:  Have you, in fact, consulted fully with your defense counsel

20    and received the full benefit of their advice?

21        ACC:  Yes, sir.

22        MJ:  Are you convinced that your counsels advise is in your own

23    best interest?

24        ACC:  Yes, it is, sir.

1    MJ:  Are you pleading guilty voluntarily, and of your own free
2    will?

3    ACC:  Yes, sir.

4    MJ:  Has anyone made any threat or tried in any way to force you
5    to plead guilty?

6    ACC:  No, sir.

7    MJ:  Do you understand that even though you feel you are guilty,
8    you still have a legal and moral right to plead not guilty and place
9    the burden on the government to prove your guilt by legal and
10   competent evidence beyond a reasonable doubt?

11   ACC:  Yes, sir.

12   MJ:  Major DePeppe, have you explained to your client his
13   evidentiary and testimonial rights on findings and on sentence?

14   DC:  Yes, I have, Your Honor.

15   MJ:  Private Armann, did you discuss with your defense counsel and
16   do you understand your evidentiary and testimonial rights both on
17   findings and on sentence?

18   ACC:  Yes, I do, sir.

19   MJ:  Do you have any further questions as to the meaning and
20   effect your plea of guilty?

21   ACC:  No, sir.

22   MJ:  Take time to consult with your counsel again, and then advise
23   me whether you understand the things that we've discussed and still
24   desire to plead guilty.

1  [Pause while the accused, defense counsel, and assistant defense
2  counsel confer.]

3    MJ:  Did you discuss those matters with your defense counsel,
4  Private Armann?

5    ACC:  Yes, sir.

6    MJ:  Do you understand everything we've done today?

7    ACC:  Yes, I have, sir.

8    MJ:  Do you have any questions about anything at all?

9    ACC:  No, sir.

10   MJ:  Do you still want to plead guilty?

11   ACC:  Yes, I do, sir.

12   MJ:  I find that this plea of guilty is made voluntarily and with
13  full knowledge of its meaning and effect.  I further specifically
14  find that the accused has intelligently, knowingly, and consciously
15  waived his rights against self-incrimination, to a trial of the facts
16  by a courts-martial, and to be confronted by the witnesses against
17  him.  Accordingly, I find that the plea of guilty is provident, and I
18  do accept it.

19      However, Private Armann, you are advised that you may request a
20  withdrawal of such plea at any time before sentence is announced,
21  and, if you have a good cause for that request, I will grant it.

22      Are there any other matters the prosecution desires to present
23  prior to my announcement of findings?

24   ATC:  No, Your Honor.

25   MJ:  Accused and counsel , please rise.

1    [The accused and his counsel did as directed.]

2    MJ:   Private Kurtis E. Armann, in accordance with your plea of

3    guilty, this court-martial finds you:

4              Of all Charges and Specifications:        Guilty.

5          Please be seated.

6    [The accused and his counsel did as directed.]

7    MJ:   Private Armann, your advised that now you may present

8    evidence in extenuation and mitigation of the offenses of which you

9    stand convicted.  You may, if you wish, present testimony on your

10   behalf, introduce documentary evidence, or you may testify under oath

11   as to these matters, or you may remain silent, in which case, I will

12   not draw any adverse inference from your silence.

13        In addition, you may, if you wish, make an unsworn statement in

14   extenuation or mitigation of the offenses of which you stand

15   convicted.  You cannot be questioned or cross-examined upon this

16   unsworn statement, but the trial counsel may offer evidence to rebut

17   anything contained therein.  This unsworn statement may be oral, or

18   in writing, or both, and you may make it, your defense counsel may

19   make it, or both of you may make it.

20        What I want you to do is consult with your counsel, and at the

21   appropriate time in the proceedings he will advise the court of your

22   desires in this regard.

23        Do you understand these rights?

24   ACC:  Yes, sir.

131

1    MJ:  Are there any corrections to be made to page 1 of the charge

2    sheet?

3    ATC:  No, Your Honor.

4    MJ:  Defense, do you concur?

5       You've got pay correct in block 7-a and c.

6    DC:  Yes, Your Honor.  No corrections.

7    MJ:  DA Form 2 alpha and 2-1 have been marked as Prosecution

8    Exhibits 2 and 3 for identification respectively.

9       Major DePeppe, do you have any objection to PE 2 and 3 for

10   identification?

11   DC:  No objection.

12   MJ:  Trial counsel, PE 2 and 3 for identification are admitted

13   into evidence as PE 2 and 3.

14      Trial, I'm going to take a recess at this point and give you a

15   chance to make decisions about your case in aggravation and resolve

16   any administrative matters.  It is approximately 12 minutes to 11.

17   Let's shoot to start back up at with the government case in

18   aggravation at 1100 hours.

19      Now, let's, before we recess, take up the issue of

20   sequestration.  We're through with providence, so at this point,

21   defense, you want the following witnesses excluded from the

22   courtroom:  Smith, Louis, Richardson, and Lund, correct?

23      We'll get to Bell in a second.

24   DC:  Yes, Your Honor.

25   MJ:  And the government position on this matter is?

132

1          As to those individuals.

2      TC:  No objection, provided that after they testify they can

3   remain present.

4      MJ:  Do you have any objection to them remaining in the courtroom

5   after they testify?

6      DC:  No, Your Honor.

7      MJ:  We'll take up the issue of Private Bell when we return from

8   recess.

9          Is there anything further from either side prior to recess?

10         Trial?

11     ATC:  No, Your Honor.

12     MJ:  Defense?

13     DC:  No, Your Honor.

14     MJ:  The court's in recess.

15  [The court-martial recessed at 1048 hours, 19 March 1999.

16  [The court-martial was called to order at 1131 hours, 19 March 1999.]

17     MJ:  The court is called to order.  All parties present prior to

18  the recess are again present.

19         During the recess we held an RCM 802 conference.  Present at

20  which were counsel for both sides and the military judge.  We

21  discussed, first, the matter of the sequencing of witness.  The

22  military judge proposed that Private Bell be called earlier in the

23  sequence of witnesses rather than later and proposed that she be

24  called first, by the court if necessary.  Too which, Major DePeppe,

133