# APPENDIX B

Court of Appeals for the Armed Forces

Article 67 Petition

Kurtis E. Armann

Court of Appeals for the Armed Forces

Kurtis E. Armann,                    )  Case No.:
                                     )
            Appellant,               )  Appeal
                                     )
     vs.                             )
                                     )
                                     )
                                     )
            Appellee                 )
     _____)


## ASSIGNMENT OF ERROR I


THE MILITARY JUDGE ERRED WHEN HE FAILED TO

CONDUCT A FULL INQUIRY INTO THE APPELLANTS

MENTAL CAPACITY TO STAND TRIAL BECAUSE THERE

WERE INDICATORS THAT THE APPELLANT LACKED

SUFFICIENT MENTAL CAPACITY TO STAND TRIAL OR

TO CONTRACT INTO A PRETRIAL AGREEMENT. THE

MILITARY JUDGE RELIED TOTALLY ON THE "EXPERT

WITNESS" AND DID NOT CONDUCT A FULL FACT FINDER

ON HIS OWN; THAT MATERIALLY PREJUDICED THE

APPELLANT FOR HE WAS DENIED SUFFICIENT COGNITIVE

ABILITY TO DEFEND HIMSELF AT TRIAL OR TO

COMPREHEND THE TERMS AND RAMIFICATIONS OF THE

PRETRIAL AGREEMENT. THAT DENIED THE APPELLANT HIS

CONSTITUTIONAL RIGHT TO A FAIR TRIAL; UNITED

STATES CONSTITUTIONAL AMENDMENT 14.

The Supreme Court, in the case of <u>Pate v. Robinson.</u> 363 U.S. 375, 86 S.C. 836; held that;

"<u>Evidence introduced on the accused behalf is state prosecution for murder entitled him to a hearing on the issue of competency to stand trial</u>" U.S.C.A. Const.Amend. 14. <u>Id at 842.</u>

"Failure of Illinois court to hold hearing on competency of the accused to stand trial in the case in which evidence entitled the accused to such a hearing <u>deprived him of his Constitutional right to a fair trial</u>" <u>Thomas v. Cunningham.</u> 313 F.2d 934, Id. 842.

C.M.R. 79; the court held that;

"<u>When a guilty plea is entered and the question of possible insanity is into the record by way of extenuation and mitigation</u>; U.C.M.J. Article 45(a) provides the accused, "<u>after a plea of guilty, sets up matters inconsistent with his plea a plea of "Not Guilty" shall be entered into the record, and the court should proceed as though he entered the latter plea, and if the evidence suggesting that a medical condition is introduced after finding the matter, the matter of setting aside the plea becomes of importance.</u>" "<u>In that event the law officer shall not let the plea of "Guilty" stand</u>" <u>He shall set aside or permit the withdrawal and hear evidence on an interlocutory basis.</u> The Manuals provisions provide adjourn the court and refer the matter to the convening authority for further investigations," <u>Id at 85.</u>

The Court of Military review in the case of <u>United States v. Victor.</u> C.G.M.C.
9909, 36 C.M.R. 814; held that;

<u>" The Board of Review can look at evidence that the court did not see because</u>
<u>of the question of mental capacity to stand trial,</u> like the question of
mental responsibility for an offense is part of the issue of insanity in a
criminal trial. Rules not applicable to the other issues apply to it.
Insanity at the time of the crime is a defense on the merits; it goes to the
question of guilt or innocence. <u>Insanity at the time of trial goes to a</u>
<u>question of no less importance; the question of whether it is fair to try an</u>
<u>accused when he might not be mentally able to protect himself. It is a</u>
<u>question of a fair trial. We could not use the evidence which the court did</u>
<u>not see to decide that the accused was not mentally responsible for his</u>
<u>offense; but we can use it to determine whether the trail should have</u>
<u>proceeded when it did."</u> <u>Id at 815.</u>

"Different standards apply to the definition of these two different parts of
the issue of insanity" <u>Id at 816.</u>

The standard of mental capacity at the time of the trial is governed under
the Manual for Court-Martial, pursuant to:

R.C.M. 909(c)(2)

"Trial may proceed unless it is established by a preponderance of evidence
that the accused is presently suffering from a mental disease or defect
rendering him incompetent to the extent that he or she is unable to
understand the proceedings against the accused or to conduct or cooperate
<u>intelligently</u> in the defense case"

Appeal - 3

Appellant contends that the government records of evidence clearly reflects

that on 8 February 1999, the government conducted a "Sanity Board" evaluation

pursuant to the Manual for Courts-Martial R.C.M 706. (See enclosure 1), that

concluded that the appellant:

> (1) Did have a psychiatric history
>
> (2) Suffered from not mental disease or defect
>
> (3) Possessed sufficient mental capacity to understand the
>     proceedings against him, and conduct or cooperate
>     intelligently in the defense.

Additionally, records of the evidence clearly reflect that at least by 8

February 1999, Prosecutorial Officials forced the administration of multiple

"psychoactive substances" that have a significant effect on mental

functioning. The Appellant was subjected to toxic amounts of these

medications and they rendered him unable to comprehend the proceeding, or to

conduct or cooperate intelligently in the Defense case while in maximum

confinement from October 10, 1998 through 19 March 1999. Further, the

Appellant asserts that the effects of these "psychoactive substances"

forcibly administered by Prosecutorial Officials completely impaired his

reasoning and cognitive processes so deficient that he was unable to exercise

his own free will, or to defend himself from Prosecutorial Officials

allegations during pretrial and post trial proceedings.

Moreover, the record of trial reflects that the "Sanity Board" on 8

February 1999 tested the Appellant, by one psychologist sitting alone. A

forensic psychologist also examined the Appellant on 18 March 1999, only 24

hours before the trial. The "chronic" nature and the physical and

Appeal - 4

psychological aspects of these medications the Appellant was ordered to take,
and the sheer number of these substances would make it impossible for someone
to assess.

The Military Judge and Prosecutorial Officials ordered the 706 "Sanity
Board" because of the "bizarre" confession taken from the Appellant, but
disregarded the "psychoactive substances" that the Appellant was on.

The records of evidence clearly reflect that had an appropriate inquiry have
been conducted the following documents would have been presented;

    (1) 16 October 1998, the Government confinement physical of the
        Appellant, that reflect that the Appellant was in the process of
        treatment for migraine headaches and he was on a couple of
        medications, but there was no consistent treatment that had worked
        for the Appellant. (See Appendix N)

    (2) On 8 February 1999, a Sanity Board Evaluation concluded that the
        Appellant had a minor psychological history but it did not rise to
        the level of a severe mental disease or defect.

    (3) In January of 1999 at an Article 39(a) session the Military Judge
        questioned the Appellants ability to comprehend the proceeding.

    (4) Defense counsel offered into evidence the name of Dr.Ebert a
        forensic psychologist from the state of California. Counsel felt
        that Dr.Ebert would be able to evaluate the Appellants mental
        functioning better than most, but the motion for this witness was
        denied.

The Appellant contends that careful examination would reveal that <u>the Appellant was under the influence of multiple "psychoactive substances" for his entire pretrial confinement to include before, during, and after trial</u>. Additionally, the record irrefutably reflects that Defense counsel that the Appellant was under the influence of multiple "psychoactive substances" had advised the Military Judge and Prosectorial Officials, yet, the Military Judge failed to:

(1) Question the forensic psychologist while he was on the stand as to the effect these medications could have on cognitive skills and overall mental functioning of the Appellant.

(2) Determine the effects of all of these medications at the prescribed dosage, taken together, over a period of 5 months in maximum confinement, and at the time of trial.

(3) Determine if a medical condition existed to justify the administration of all of these medications.

(4) Determine if a medical condition did exist, <u>was there a less intrusive way to control the condition.</u>


The Appellant asserts the records of evidence clearly established the Appellants medical condition did not justify the amount and type of medications that the Appellant was on. Prosecutorial Officials who did not have the power to object to the treatment forced these medications on the Appellant. The question is why were the Prosecutorial Officials forcibly administering "psychoactive" medications at near toxic levels as to cause physical intoxication to the Appellant while he was in maximum custody confinement. The Military Judge failed to conduct a <u>though</u> inquiry that the

Appellant was entitled to which resulted in a record void of essential

information tantum for an adequate appellate review. Just as important, the

Governments own records of evidence, to include medical records, the R.C.M.

706 "Sanity Board" conclusion proved that there was no medical justification

for the significant number of medications that the Prosecutorial Officials

forced on the Appellant. This irrefutably establishes the Governments

violation of the Appellants right to "due process" and the "prosecutions

manipulations of material evidence" "in favor of the appellant, during

pretrial and trial phases. However to refocus the issue at hand, the Military

Judges failure to conduct a complete and accurate inquiry that the Appellant

was irrefutably entitled to has resulted in a record insufficient to

determine that the Appellant was competent to stand trial, or to contract

into a pretrial agreement.


       The Supreme Court in the case of Dusky v. United States, 362 U.S. 388,

80 S.Ct. 788 held that;

       "The test of a defendants competency to stand trial is whether he has

sufficient [present] ability to consult with his lawyer with a reasonable

degree of rational understanding; and whether he has rational as well as

factual understanding of the proceedings against him; and it is not enough

that he is oriented to time and place and has some recollection of events"

Id. at 788.


       "The Supreme Court in the case of Pate v. Robinson, 363 U.S. 375, 86

S.Ct. 836, held that;

"Stipulation of doctors testimony that in his opinion the accused knew
the nature of the charges him and was able to cooperate with counsel when he
examined him 2 or 3 months before state trial was some evidence of the
accused ability to assist in his defense, but could not properly have been
deemed positive on the issue of the accused competence to stand trial.
U.S.C.A. Const. Amend. 14; S.H.H. ch. 38 § 104-1 to 104-3, Id. at 842.

Further, the Supreme Court in the case of Dusky held that;

"The record insufficiently supported a finding of competency to stand
trial," 18 U.S.C.A. § 4241.

"In view of doubts and ambiguities over a year had passed regarding
legal significance of psychiatric testimony in the case and retrospectively
determining competency to stand trial," Id. at 789.

Thus the court reasoned and ordered;

"Finding of competency to stand trial was insufficiently supported by
the record, would reverse judgement of Court of Appeals affirming judgement
of conviction and would remand the case to District Court for a new hearing
to ascertain the defendant present competency to stand trial and for a new
trial should he be found competent."

Therefore, the Appellant asserts the present case as a composite mirror
of the Supreme Court cases of Dusky and Pate v. Robinson, further, that the
Appellate has been and still is prejudiced by the Military Judges error,
absence his error the trial would not have proceeded and without Prosecutoial

Appeal - 8

Officials forced administration of "psychoactive substances" the Appellant would not have plead guilty and exercised his rights at trial. Thus, the Military Judges failure to hold a hearing, to pursue a full fact finding mission on the issue of the Appellants competency to stand trial in the Governments prosecution of charges which fell short of murder, but are tried the same as murder. Strong material evidence entitled the Appellant to such a hearing deprived him of the Constitutional right to a fair trial, guaranteed under by the Constitution.

The Supreme Court in the case of Pate v. Robinson, 363 U.S. 375 S.Ct. 836, held that;

"Upon determination of the accused Constitutional rights abridged by his failure to receive an adequate hearing on his competence to stand trial, a writ of Habeas Corpus must issue and the accused must be discharged, unless he has been given a trial within a reasonable time." U.S.C.A. Const. Amend. 14, Id. at 842-843.

Secondly the Appellant asserts the Pretrial Agreement and Stipulation of Fact were obtained while the Appellant lacked sufficient mental capacity to voluntarily, consciously, and intelligently contract into a Pretrial Agreement due to the effects of the Prosecutorial Officials forced administration of "psychoactive substances."

The Supreme Court in the case of Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, held that;

"Forcing anti-psychotic drugs on a convicted person absent a finding of overriding justification and determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the state detained for trial. Pretrial detainees who have not been convicted of any crimes, retain at least those Constitutional rights that we all hold that are enjoyed by convicted persons," Id. at 1877.

The Supreme Court in the case of Riggins v. Nevada, 504 U.S. 127, 112A S.Ct. 1810; held that;

"in the case of anti-psychotic drugs like Mellaril interference is particularly severe," Id. at 1814.

"The purpose of these drugs is to alter the chemical balance in the patients brain, leading to beneficial, in his or her cognitive processes. While the therapeutic benefits of anti-psychotic drugs are well documented, it is also true that these drugs can have serious, even fatal side effects. One such side effect identified by trial courts is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes. The trial court found that it might be treated and reversed using the medication, Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an ability to sit still), neuroleptic malignant syndrome (a relatively rare condition), and tardive dyskinesia, perhaps the most discussed side effect of anti-psychotic drugs" Id. at 814.

The Appellant asserts, the Governments own records of evidence irrefutably establish, Prosecutorial Officials had no justification to

administer "psychoactive substances," in the amount that they did to the
Appellant, which caused harm to the Appellant. and just as important the
Prosecutorial Officials forced administration to the Appellant:

(1) Paroxitine

(2) Prochlorperazine

(3) Midrin

(4) Secobarbital

(5) Hydroxine

(6) Merperidine

(7) Firocet

(8) Fironal

(9) Sumatriptan

(10) Promethazine

(11) Paroxitine

The medication logs that are attached to this brief clearly reflect
these facts beyond a reasonable doubt. This in turn places most of the guard
force at the Mannheim Confinement facility as material witnesses to
substantiate these facts.

Furthermore, the Appellants father, Mr.Aurthor Armann, consulted a
pharmacist who explained to him that this combination of medications could be
lethal given the proper circumstances. A full fact finding mission would
confirm these facts.

This was without the consent of the Appellant. This amounted to "Forced
administration of toxic amounts of "psychoactive substances"" while the

Appeal - 11

Appellant was in a maximum custody confinement for at least 158 days from 12 October 1998 through 19 March 1999, the day of the court-martial. Therefore, the Governments own records irrefutably show <u>the Government violated the Appellants Fourteenth Amendment guarantees.</u>

In the Appendices that are attached to this brief you can see through the medication logs at the end of each section that a partial record does exist, and it does reflect that the Appellant was on a significant number of "psychoactive substances." The dates that should be looked at with a certain amount of scrutiny are the dates of:

    (1) 2 February 1999 (The date of the 706 "Sanity Board")

    (2) 18 March 1999 (sanity evaluation by LTCDR Caruso)

    (3) 19 March 1999 (Date of the court-martial)

The Appellant was drugged during the entire process of preparing and the act of actually going to trial, and therefore, his rights were violated.

The *Supreme* Court in the case of <u>Riggins</u> held that;

"<u>Due process prohibits prosecuting officials from administering involuntary doses of anti-psychotic medications for the purpose of rendering the accused competent for trial,</u>"-"<u>state command medication during pretrial and trial phases of the case for the avowed purpose of changing the defendants behavior, is much the same as prosecution manipulating evidence,</u>" <u>Id at 1827.</u>

The Supreme Court, in the case of <u>Rogers v. Richmond,</u> 365 U.S. 534, 81 S.Ct. 735; held that;

"<u>Test of admissibility of confessions as voluntary was whether state officials behavior had been such as to overbear defendants will to resist and to bring about confessions not freely self determined, not the probable truth or falsity of confessions,</u>" U.S.C.A. Const. Amend.  14, <u>Id. at 739</u>.


"<u>Convictions following admissions of involuntary confessions admissions can not stand regardless of trustworthiness of confessions</u>", U.S.C.A. Const. Amend.  14, <u>Id at 739</u>.


The Appellant asserts, absence of the Prosecutorial Officials forced administration to him numerous "psychoactive substances," he would have exercised his substantial and fundamental rights to a full and fair trial. However, the effects rendered him unable to comprehend the nature of the proceedings, his "due process" rights <u>the law guarantees</u>, the complex effects and ramifications of the Pretrial Agreements terms.  And just as important the effects the "psychoactive substances" destroyed his free will to resolve, for he believed he had no choice but to sign the Pretrial Agreement and Stipulation of Fact, which he did unknowingly, involuntarily, unintelligently, and unconsciously.


The facts are simply indisputable, the Prosecutorial Officials transported the Appellant to a maximum security confinement facility, after the confinement hearing, determined that his prescribed treatment regiment varied significantly because <u>no suitable treatment had worked on the</u>

<u>Appellant</u>.  At the time of his initial confinement the Appellant was

prescribed:

     (1)  Paroxitine

     (2)  Prochlorperazine

     (3)  Promethazine

     (4)  Tiagabine

     (5)  Midrin

     (6)  Secobarbital

     (7)  Hydroxine

     (8)  Merperidine

     (9)  Firocet

     (10)  Fironal

     (11)  Sumatriptan


However, the alleged offenses were contradicted by exceptionably strong

material evidence and expressly refuted by the Appellant.  Subsequently,

Prosecutorial Officials forcibly drugged the Appellant and he signed the

Pretrial Agreement while on suicide watch and under the influence of multiple

"psychoactive substances".  Then, the Appellant was tried by court-martial

while <u>heavily sedated</u>. Prosecutorial Officials relied on the Pretrial

Agreement and Stipulation of fact that was signed by the Appellant and the

Appellate Courts decisional law in <u>United States v. Tenny</u>.  However, the

Pretrial Agreement and Stipulation of Fact, A contract, was obtained after

Prosecutorial Officials forcibly administered <u>toxic amounts of "psychoactive</u>

<u>substances."</u> that violated the Appellants substantial and fundamental right

to "due process," which rendered the Appellant without sufficient mental

capacity to understand the Pretrial Agreement. The overall situation clearly violates the elements of a legal and enforceable contract by any standard. In fact the record clearly and heinously reflects a "Military Judicial Date Rape" of the Appellant by these Prosecutorial Officials.

The case law that is contained herein focuses on the facts that antipsychotic medication was administered to individuals without their consent, and that this action was illegal. The Appellant believes that the Government is going to attempt to state the medications that the Appellant was on were for pain, but as you will see in this brief, the medications also double as antipsychotic medication. In fact, these medications are prescribed for simple anxiety to psychosis such as schizophrenia.

However, the Appellant asserts the record of evidence and the record of trial clearly irrefutably reflected the Military Judge erred when exceptionally strong evidence was submitted that indicated that the Appellant lacked sufficient mental capacity to stand trial, and the Military Judge also denied the Appellant the right to be evaluated by a qualified care giver who would be able to assess all of the Appellants heath problems and how they went to the state of mind of the Appellant. Additionally, the Military Judge erred when he failed to inquire into the whether the Appellant had sufficient capacity to contract into a pretrial agreement, where the Appellants medical records clearly reflected that the Appellant was under the influence of multiple "psychoactive substances" for months prior to and when he entered into a pretrial agreement and the stipulation of fact. Moreover, the Military Judges and Prosecutorial Officials own questions into the Appellant ability

to comprehend <u>after being medicated to a significant degree,</u> raises

substantial questions as to what observation or information had been provided

as to the Appellants demeanor and behavior.


The Appellant asserts that the bottom line on these issues is that

Prosecutorial Officials forcibly administered "psychoactive substances" to

the Appellant to achieve an unfair advantage at trial, and did this to such a

degree that <u>the amounts of medications the Appellant was on was toxic.</u> This

was done without justification or the Appellants consent, while he was in a

maximum-security confinement facility. After 158 days the effects of the

daily administration of "psychoactive substances" to the Appellant, and on

the days before, during, and after trial by general court-martial, he signed

a Pretrial Agreement sponsored by the Government.  At the Court-Martial the

same substances where administered to him once again.   Thus, the Appellant

had entered into a Pretrial Agreement and he was tried while he was under the

influence of multiple "psychoactive substances" that rendered him without

sufficient mental capacity to enter in to a pretrial agreement or to stand

trial, which was a violation of his Fourteenth Amendment rights guaranteed by

the Constitution of the United States.


### ASSIGNMENT OF ERROR II

*THE APPELLANT WAS SUBJECTED TO CRUEL AND UNUSUAL*

*PUNISHMENT WHEN PROSECUTORIAL OFFICIALS FORCED THE*

*ADMINISTRATION OF "PSYCHOACTIVE SUBSTANCES" TO THE*

*APPELLANT WHICH WAS DONE WITHOUT JUSTIFICATION, AND*

DENIED THE APPELLANT "DUE PROCESS" UNDER THE LAW.

U.S.C.A. Const. Amend. 8 and 14.

In military prisons not are you only subject the rules of prison, you are also subject to the Uniformed Code of Military Justice. To disobey an order such as to take prescribed medication would result in punishment under the establishment of prison, but also the U.C.M.J.

The Supreme Court in the case of <u>Riggins v. Nevada,</u> 112, S.Ct. 1810; held that;

"<u>It was an error to order the defendant to be administered anti-</u> <u>psychotic medication during to course of his trial over his objections</u> <u>without findings that were no less intrusive alternatives, that the</u> <u>medication was medically appropriate, and that it was for the sake of the</u> <u>defendants safety or the safety of others</u>"

The case of <u>Riggins</u> also held;

"The forced administration of anti-psychotic medications during the trial violated rights that are <u>guaranteed by the Sixth and Fourteenth</u> <u>Amendments.</u>

"There is a strong possibility that the courts error impaired <u>Riggins</u> constitutionally protected rights. Efforts to prove or disprove actual prejudice from the record before this court would be futile, and guesses as to the trial outcome had <u>Riggins</u> motion been granted would be speculative. While the precise consequences of <u>forcing Mellaril upon him can not be shown</u>

from the trial transcript, the testimony of the doctors who examined him

establishes the strong possibility that his defense was impaired. Mellarils

side effects may have impacted not only his outward appearance, but also his

testimonys content, his ability to follow the proceedings, or the substance

of the communication with his counsel. Thus, even if the expert testimony

presented at trial allowed jurors to assess Riggins demeanor fairly, an

unexceptable remained that forced medication compromised his trial rights.

An expert witness just as Riggins examined the Appellant, and it was the

day before his trial. During this interview none of the Appellants

medications were taken into account and none of the "bizarre behavior" was

mentioned. The evidence revealed that his likelihood to reoffend was very

low, but the expert witness did not provide testimony of what these

medications could be doing to the Appellant physically and psychologically.

Furthermore, the Prosecutorial Officials or the Military Judge did not

address these relevant facts during to trial. It was almost as if they

avoided them on purpose.

The amounts of medications, the type, and the effects of these should

have been an issue before the trial, and the Appellant was tried before a

court-martial. By this time, it was almost too late to change the strategy of

the trial, and this denied the Appellant the right to a fair and unbiased

trial. Both of the psychologists that evaluated the Appellant, one for the

R.C.M 706 "Sanity Board", and the forensic psychologist the day before the

trial failed the mention this very relevant fact. Both of them knew that this

was going to change the progression of the trial. The psychologist for the

Appeal - 18

706 "Sanity Board" did not complete any testing that would evacuate the amount of medication that was in the Appellants system, and this could have been completed with a toxicology screening. <u>It was obvious that the mind of the doctor was made up before the Appellant stepped in the door.</u> His testing was limited to the MMPI-2 (Minnesota muti-phasic personality inventory) and a very brief interview to ensure that the Appellant was oriented with time and surrounding. As you know from the case law that has been cited thus far, you know that this standard is not enough to assess totally. The MMPI-2 does not test for intoxication; it is a fill in the dot style test. The <u>only</u> way to test for drugs is with a toxicology screening.

<u>The level of intoxication was obvious to the guard force at the Mannheim Confinement facility who kept the Appellant segregated from the rest of population in D-Block maximum custody, due to the amount of medication that the Appellant was on at the time. In addition to this issue, the staff took special precautions with the Appellant such as excusing him early from dinner so he could "sleep off" the medication that he was on, or to escort him back to his domicile because he had gotten sick much the way that an alcoholic does when they are "hung over."</u>

At this current time since his confinement at the United States Disciplinary Barracks, the Appellant been placed on two anti-psychotic medications Thorazine and Seraquil, both *major tranquilizers*, and MS Contin (morphine sulfate). The Appellant has exhibited a significant amount *tolerance* to these medications. <u>The only way to achieve *tolerance* is to be placed on so much of a dose that is frequently administered over a period of</u>

time. The reaction to this is that the body is going to require more of a
dose to achieve the same results. The Appellant is almost completely "opioid
tolerant" which is an indicator that he has been on medications for a
significant amount of time, and its action on the body was significant.
Medication in prison is controlled by the guard force, so the Appellant had
to be prescribed the medications this way. Obviously the amount was
significant, but it had to be prescribed this way to begin with. The
Appellant does not have the option of taking more than the recommended dosage
because he can not self medicate. (See Appendix B)

### ASSIGNMENT OF ERROR III

THE UNIFORMED CODE OF MILITARY JUSTICE STANDARD
PRESUMES THAT THE DEFENDANT TO BE COMPETENT TO STAND
TRIAL UNLESS HE PROVES HIS INCOMPETENCE BY A CLEAR AND
CONVINCING EVIDENCE ALLOWS THE DEFENDANT TO BE PUT
TO TRIAL EVEN THOUGH IT IS MORE THAN LIKELY THAN
NOT THAT HE COULD BE INCOMPETENT AND THUS VIOLATES
THE DEFENDANTS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH
AMENDMENT; DEFENDANTS RIGHT TO BE TRIED ONLY WHILE
COMPETENT OUTWEIGHS THE GOVERNMENTS INTEREST IN
EFFECTIVE OPERATION OF ITS JUSTICE SYSTEM. U.S.C.A.
CONST. AMEND. 14

### ASSIGNMENT OF ERROR IV

DEEP ROOTS AND FUNDAMENTAL CHARACTER OF THE DEFENDANTS

RIGHT NOT TO STAND TRIAL WHEN IT IS MORE THAN LIKELY

THAN NOT THAT HE LACKS CAPACITY TO UNDERSTAND THE

NATURE OF THE PROCEEDINGS AGAINST HIM OR HER OR TO

COMMUNICATE EFFECTIVELY WITH COUNSEL MANDATE

CONSTITUTIONAL PROTECTION UNDER THE FOURTEENTH

AMENDMENT. U.S.C.A. Const. Amend. 14


### ASSIGNMENT OF ERROR IV


THE MILITARY JUDGE IMPROPERLY ACCEPTED THE GUILTY

PLEA OF THE APPELLANT WITHOUT FIRST INQUIRING INTO

THE MEDICATION THAT WAS PRESCRIBED TO HIM. IF THE

MILITARY JUDGE WOULD HAVE INQUIRED INTO THE EFFECTS

OF THE MEDICATION AND HOW THE EFFECTS WERE DETRIMENTAL

ON THE MIND AND BODY HE WOULD HAVE NOT ACCEPTED THE

APPELLANTS PLEAS. THE NUMBER AND DOSAGE OF THESE

MEDICATIONS WOULD RENDER THE APPELLANT *NON COMPOS*

*MENTIS* TO STAND TRIAL.


The Appellant was on numerous medications at the same time. Many of them have interaction warnings with one another. Some of the medications are used to treat mental disorders, although they are not prescribed regularly for this. (See all Appendices)

A clear evaluation as to the mental status of the Appellant could have only been completed if the Appellant was off all of the medications, but at the same time, the medications could be what were hastening the psychological problems to begin with. There is just no way to be sure of all of this except to put all of the factors into play instead of only a few of them.

I present this question before the court, how can a psychological evaluation be completed, and be accurate at the same time, when the Appellant is on medications that would hide symptoms of major mental illness if this was the case? The Appellant had other issues that the court needs to be aware of before they render a decision about this matter. Besides the medication, the Appellant had other issues that could cause psychological strain on the body somewhat that they would have noticeable effects: chronic pain, and sleep deprivation. Both of these can have serious effects on the body if they are continued for a significant amount of time without treatment just as they were with the Appellant.

So far in this brief all the Appellant has done is show the court what constitutes sanity to stand trial or to contract into a pretrial agreement, but this is the point where the law and medicine collide. The following is a report of the prescribed medications that the appellant was on at the time of trial. What I would ask of the court is to look at all of this information and keep in mind that this is the same medication that the Appellant was on at the time before and during to time of his trial.

In the normal amounts, that these medications are prescribed the chance of side effects is about normal, but when you start to mix all of the different drugs the possibility of what could happen becomes an issue. The Appellant asserts that the psychological evaluation(s) could not have been accurate. The reason that the Appellant asserts this fact is that just because a medication is prescribed for pain does not mean that it does not have other prescribed uses. I cite the example of the drug Compazine that is usually prescribed for nausea and vomiting. Compazine is also used for the treatment of psychoses. (See Appendix H; and also Medication report Appendix E)  This only raises more significant questions concerning the mental health of the Appellant.

All of the medications and data on all of them can be found in books about medication, but some of the same medications can also be found in psychology and psychiatry books. Why would that be? The reason is due to the significant impact that these medications can have on the human body.

The Federal Court in the case of Nguyen v. Reynolds, 131 F.3d. 1340; held that;

Trial of an incompetent defendant violates substantive due process. U.S.C.A. Const. Amend. 5. 14.

The Supreme Court, in the case of Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 155 L.Ed.2d 640 (1991); held that;

"Generally, federal habeas review of procedurally barred issues is foreclosed "unless the prisoner can demonstrate cause for default and actual

prejudice as a result of the alleged violation of federal law, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice."

The Federal Court in the case of <u>United States v. Williams</u>, 819 f.2d 605, 609 (5th Cir. 1987)

"...to raise doubt, [the petitioner] must present facts sufficient "to positively, unequivocally, and clearly generate a real substantial and legitimate doubt" concerning his mental capacity.

## ASSIGNMENT OF ERROR V

EVIDENCE THAT WAS NOT AVAILABLE AT THE TIME OF TRIAL
BECAME AVAILABLE RECENTLY THIS INFORMATION COULD HAVE
A SIGNIFICANT EFFECT ON THE APPELLANTS APPEAL.

In 1996, the Appellant was prescribed the drug Accutane for cystic acne. At the end of the cycle of this drug, the Appellant began to have significant health problems that were physical as well as psychological. The Appellant had to seek medical help in December of 1996 when he began to have severe migraine headaches that would not go away with conventional treatment. The Appellant was sent to two specialists, one was an Internal Medicine Doctor,

and one was a neurologist. Both of them were located in the Republic of
Germany where the Appellant was stationed for duty. The Appellants condition
was a mystery for the most part, and over the period of 16 months, the
condition was even worse. On 11 October 1998, the Appellant was incarcerated.
His condition was unpredictable and he was forced to continue treatment
before, during, and after the trial. Sometime in the month of August of 2000,
a possible link to the Appellants medical problems and the drug Accutane
became an issue of great concern. Public officials began to put pressure on
the pharmaceutical company, Roche Pharmaceuticals, and the company was forced
to change its labeling to include new warnings about the medication. The new
warnings read as follows: Accutane can cause depression, suicide attempts,
suicide, and psychosis. Follow on care may be necessary after cessation of
treatment. The company went on to deny the link but went on to force new
Accutane patients to sign a "psychiatric consent form" which has to be signed
before treatment can begin. (See Appendix O for new warnings)


This now raises serious questions about what may have happened to the
Appellant who had no previous medical problems before the 1996 treatment with
this medication. The Appellant was considered a model soldier before his
medical problems. The Appellant asks the Court to weigh this with a high
level of scrutiny.


### ASSIGNMENT OF ERROR VI


THE JUDGE ADVOCATE AND THE CONVENING AUTHORITY WERE

DISQUALIFIED FROM TAKING ACTION IN THE FORM OF A

REVIEW TO DECIDE SENTENCE APPROPRIATENESS AND OTHER
FACTS OF LAW DECIDED BY GENERAL COURT-MARTIAL BECAUSE
THEY WERE INVOLVED IN A GRANT OF IMMUNITY AND CLEMENCY
TO A PROSECUTION WITNESS. THIS RESULTED IN AN ILLEGAL
CONVENING AUTHORITY ACTION WHICH SUBSTANTIALLY DENIED
THE APPELLANT OF HIS RIGHTS AND MATERIALLY PREJUDICED
THE APPELLANT. U.S.C.A. Const. Amend. 6

### Argument

### The Staff Judge Advocate was disqualified from post-trial review

Sometime in December of 2000, while the Appellant was serving his
sentence at the United States Disciplinary Barracks in Ft.Leavenworth,
Kansas, the effects of the incorrect and forcibly administered medications
subsided to the point that the Appellant was able to realize exactly what had
taken place in regard to his conviction.

It is only an accident that the Appellant is now able to conduct himself
in a manner which one would consider normal. The reason that the Appellant
asserts these facts to the court is that this information is needed to
appreciate the magnitude of this issue. If the company that was making the
drug Secobarbital would have not discontinued its production this past year
this situation would have not changed the way that it did, in the favor of
the Appellant. The United States Army was forced to change the Appellants
pain regiment. Many of the Appellants medications, specifically the number of

highly potent barbiturates and narcotics, were stopped, and or changed. Since this time, a <u>reliable regiment was implemented which enables the Appellant to function normally</u>. As this regiment works more of the medications are stopped.

Now that this situation has been explained in a manner to clear doubt the Appellant will now focus on the issue at hand:

Congress empowered by the U.S. Constitution Article I, section 8, clause 14, "to make rules and regulations for land and naval forces." Congressional Statutes are applicable to members of the armed forces, all members.

In fact, Congress enacted 18 U.S.C § 201 Bribery of public officials and witnesses, "for the protection of the public from the corruption of public servants and the evil consequences of that corruption." The tern public servant includes persons who perform on behalf of the United States. Therefor, the Convening Authority, and the Staff Judge Advocate, are public servants. In specific 18 U.S.C. § 201(h) states;

"Whoever, directly or indirectly, owes, offers, or promises anything of value to any person, for or because of testimony under oath or affirmation, given or to be given by such persons as a witness upon a trial or hearing...," violates 18 U.S.C. § 201(h) and is subject to two (2) years confinement.

The Court of Military Appeals, in the case of <u>United States v. Sierra Albino</u>, 23 USMCA 63, 48 CMR 534; held that;

Appeal - 27

"An agreement to grant clemency to a prosecution witness in exchange for his testimony against the accused was negotiated by trial counsel, <u>the Staff Judge Advocate was disqualified to review the record absent evidence that the agreement as to clemency was negotiated solely by trial counsel with the blessings of his superiors.</u>"

Therefor, The Staff Judge Advocates erroneous conclusion of the law and his misstatement of law for the Convening Authority resolution, resulted in the Convening Authorities violation of Congressional Statute and his possible confinement for two (2) years and loss of his retirement benefits, and the irrefutable establishment that the Staff Judge Advocate was disqualified from post-trial review of the case.

In conclusion, whether taken individually or cumulatively the Staff Judge Advocate misstated material facts, omitted facts he saw necessary to omit, and his erroneous factual conclusions and misstatements of the law, coupled with disputed facts, undeniably disqualified the Staff Judge Advocate as a post-trial reviewer of the case.

Furthermore, when the disqualified Staff Judge Advocate reviewed and made recommendations to the Convening Authority, the Appellant was denied fair and impartial review as provided under the codal provisions that substantially prejudiced the Appellant from virtually unlimited relief, from the Convening Authority, which can not be cured by appellate authorities, unless the case is reversed.

<u>The Convening Authority was disqualified from post-trial review of the case</u>

The Court of Military Appeals, in the cases of <u>United States v. White</u>,
10 USCMA 63, 27 CMR 138; <u>United States v. Mayfield</u>, 20 USMCA 292, 45 CMR 66;
and <u>United States v. Sierra Albino</u>, 23 USCMA 63, 48 CMR 534; established
precedent case law that consistently held that;

"A Convening Authority may not involve himself in a grant of
immunity/clemency to a prosecution witness and thereafter act on the case."

The High Courts rationale is simply that;

"A Convening Authority renders his impartiality suspect with reference
to weighing testimony of the witness to whom he granted immunity/clemency,"
and the court held;

"It is asking too much of the Convening Authority to determine weight
given witness testimony since he granted immunity."

The Court of Military Appeals, in the case of <u>United States v. Lochousen</u>, 8
MJ 262 (1982) provided additional guidance when it held that;

"<u>The Convening Authority who approved the finding of the case and</u>
<u>sentence of the court-martial was not the same officer who was in command</u>
<u>when the agreement was made and when the charges where referred to trial</u>."

The Lochousen Court concluded that;

"The relationship...between [the officer extending immunity] action and...The General court-martial Convening Authorities responsibility as a successor commander, is so attenuated as to preclude any reasonable expectation that the Generals judgement as to the credibility of the witness was influenced by...[the officer extending immunity] action"

More recently, the Court of Appeals for the Armed Forces, formerly the Court of Military Appeals, in the case of United States v. Sorrell, 47 MJ 432 (1993) reemphasized their opinion in United States v. Turesik, 13 MJ 442 (1982) and stated that for the Convening Authority or Staff Judge Advocate to be disqualified;

"There must be some direct unattenuated casual relationship between the grant of clemency or immunity and the subsequent action of the Convening Authority"

The bottom line is that the Staff Judge Advocate and the Convening Authority were disqualified to review or to act on this case, and the chronology of the Governments own records establish a direct unattenuated relationship between the Convening Authority and the Staff Judge Advocates grant(s) of immunity to PFC Toni Bell and PVT Jeremy Lund, prosecution witnesses, and subsequent action. Therefore, the Appellant requests appropriate action and to place the burden squarely on the shoulders of the

Government on the entire issue. This would also place the blame on the subseqent military offenders, which would send the message that "the law under the U.C.M.J. applies to all members of the Armed Forces."

Additionally, whether the Staff Judge Advocate and the Convening Authority are prosecuted for their crimes and manipulation of the U.C.M.J. or by federal authorities, the evidence is staggering, and a conviction is almost guaranteed.

The Appellant respectfully requests that the record of trial be returned to an impartial Convening Authority, and the findings of this case are set aside prompting a though review of all of the circumstances of this case.

ASSIGNMENT OF ERROR VII

THE PRISON OFFICIALS SHOWED "DELIBERATE INDIFFERENCE" BY PLACING THE APPELLANT IN SEGREGATION FROM GENERAL POPULATION IN WHICH HE WAS ADMINISTERED "PSYCHOACTIVE SUBSTANCES" THAT CLOUDED HIS JUDGEMENT AND ACTED ON ONE ANOTHER IN AN UNPREDICTABLE MANNER TO THE POINT THAT THE APPELLANT HARMED HIMSELF ON TWO SEPARATE OCCASIONS. THE PRISON OFFICIALS NOT ONLY HAD A DUTY TO PROTECT THE PRISONER OR DETAINEE FROM OTHER PRISONERS, BUT TO ALSO PROTECT HIM FROM HIMSELF IF HE LACKS THE ABILITY TO DO SO HIMSELF.

The Supreme Court, in the case of <u>Farmer v. Brennan</u>, 114 S.Ct. 1970, held
that;

     "Prison officials may be held liable under the 8th Amendment for denying

humane conditions of confinement only if the know that the inmates face a

substantial risk of harm and disregard the risk by failing to take reasonable

measures to abate it and <u>remand would be required to determine if prison</u>

<u>officials would have liability under above standards if or not preventing</u>

<u>harm allegedly occurring in present case</u>.


     The amount of medication that the Appellant was on posed not only a

physical danger, but due to the "psychoactive" effect that they had posed a

danger psychologically also. With the amount of medication that the Appellant

was on, he was an accident or an overdose waiting to happen. The Appellant

had tried to harm himself three times before he had ever gone to trial, two

before the commission of any offenses, once in confinement before the court-

martial, and once after the trial had taken place. The last time was of such

severity that the Appellant cut himself over forty (40) times and required

over eighty-one stitches to repair the damage. While this does <u>not</u> qualify as

psychosis, it does indicate some sort of problem.


     The prison officials further violated the Appellants rights when he

returned from the hospital after treatment for the last suicide attempt. He

was placed in "strip intact" upon arrival. This means that the only thing

that the Appellant had in his cell was a bible, and no clothing of any type.

There was a camera in the cell and a guard was placed about two feet from the

door. The prison officials did not prevent females from entering the area, and they directly viewed him. The prison officials failed to follow the eight-step plan for suicide victims, which is used in most hospitals to promote recovery. (See Appendix C) (Also, see Appendix D for observation report)

The prison officials made up their own rules as they went along and it was more of an issue of retribution against the Appellant. The guard outside of the Appellant cell could have easily been in the cell in less than ten seconds if an issue would have arose. There was no need for such extreme measures against the Appellant. This was physical punishment against the Appellant, which is forbidden by the Constitution of the United States. Const. Amend 8.

"Deliberate indifference" "on the part of prison officials, required to be shown in order to establish Eighth Amendment violation arising out of failure to prevent harm, requires more than ordinary lack of care for prisoners interests or safety."

In conclusion, the only way that justice can be served is for a full fact finder to take place immediately. The Appellant respectfully requests that the record of trial be returned to the convening authority for remand and that the finding of this case be set aside pending a new trial.

Dated this 5th  day of August 2001

_____
Kurtis E. Armann