IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

| | |
|---|---|
| U N I T E D   S T A T E S,<br>      Appellee<br><br>    v.<br><br>Private E-1<br>Kurtis E. Armann,<br>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,<br>United States Army,<br>     Appellant | } BRIEF ON BEHALF OF APPELLEE<br>} IN RESPONSE TO APPELLANT'S<br>} PETITION FOR NEW TRIAL<br>}<br>}<br>} Crim. App. No. 9900316<br>}<br>} USCA Dkt No. 01-0794/AR<br>}<br>} |

CA04-118E

TO THE JUDGES OF THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

            SUSANA E. WATKINS
            Captain, JA
            Office of The Judge Advocate
              General, United States Army
            Appellate Government Counsel
            (703) 588-5271


            PAUL T. CYGNAROWICZ
            Major, JA
            Office of The Judge Advocate
              General, United States Army
            Appellate Government Counsel


            STEVEN T. SALATA
            Colonel, JA
            Office of The Judge Advocate
              General, United States Army
            Chief, Government Appellate
              Division

RCDA

INDEX TO BRIEF

ISSUE PRESENTED..................................................2, 6

    WHETHER OR NOT GOOD CAUSE EXISTS TO ORDER A
    NEW TRIAL WHERE A DEFENSE OF ACCUTANE
    INDUCED PSYCHOSIS WAS NOT PRESENTED AT TRIAL
    BECAUSE THE PSYCHOTIC EFFECTS WERE NOT
    KNOWN.

STATEMENT OF THE CASE.............................................2

STATEMENT OF FACTS................................................3

SUMMARY OF ARGUMENT...............................................7

STANDARD OF REVIEW................................................7

DISCUSSION........................................................8

CONCLUSION ......................................................14

TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES

COURT CASES

United States Court of Appeals For The Armed Forces/Court of Military Appeals

    *United States v. Roeseler*, 55 M.J. 286 (2001) ..........3

    *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982)...6

    *United States v. Young*, 43 M.J. 196 (1995)........7,8,14

    *United States v. Van Tassel*, 38 M.J. 91 (1993)..........7

Army Court of Criminal Appeals

    *United States v. Armann*, Army 9900316 (Army Ct. Crim. App. 24 April 2001) ............................................3

Uniform Code Of Military Justice

    Article 80..........................................2

    Article 81..........................................2

    Article 92..........................................2

    Article 112a........................................2

    Article 73..........................................7

Manual for Courts-Martial

    Manual for Courts-Martial, United States, R.C.M. 1210(f) (2000) ..............................7,8,12,14

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

| | |
|---|---|
| U N I T E D   S T A T E S, Appellee | } BRIEF ON BEHALF OF APPELLEE<br>} IN RESPONSE TO APPELLANT'S<br>} PETITION FOR A NEW TRIAL |
| v. | } |
| Private E-1<br>Kurtis E. Armann,<br>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,<br>United States Army,<br>Appellant | } Crim. App. No. 9900316<br>}<br>} USCA Dkt No. 01-0794/AR<br>} |

TO THE JUDGES OF THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

### Issue Presented

WHETHER OR NOT GOOD CAUSE EXISTS TO ORDER A NEW
TRIAL WHERE A DEFENSE OF ACCUTANE INDUCED
PSYCHOSIS WAS NOT PRESENTED AT TRIAL BECAUSE THE
PSYCHOTIC EFFECTS OF ACCUTANE WERE NOT KNOWN.

### Statement of the Case

Pursuant to his pleas (R. 76), appellant was convicted of four offenses: attempted premeditated murder, conspiracy to commit premeditated murder, wrongful possession of a silencer and firearm in violation of USAREUR Regulation 600-1, and wrongful use of marijuana, in violation of Articles 80, 81, 92, and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. sections 880, 881, 892, and 912a (1998) (R. 131; Charge Sheet). Appellant was sentenced to a dishonorable discharge, thirty-eight years confinement, and forfeiture of all pay and allowances (R. 382).

The convening authority approved the adjudged sentence, but limited confinement to thirty-five years, consistent with appellant's pretrial agreement (Appellate Exhibit (AE) XI). The Army Court of Criminal Appeals affirmed the findings and sentence, as approved by the convening authority. *United States v. Armann*, Army 9900316 (Army Ct. Crim. App. 24 April 2001) (per curiam) (Appendix A). Appellant filed a Petition for New Trial with this Court and on 15 November 2001 filed his Brief in Support of Petition for New Trial.

### Statement of Facts

Appellant entered into a "contract for murder," agreeing to kill PFC Toni Bell's in-laws because they were seeking custody of her minor son (R. 96, 231, 234-8, 249; Prosecution Exhibit (PE) 1 at p. 2-3).[1] PFC Bell later backed out of the deal, but appellant still tried to collect on the unpaid $5,000 down payment (R. 96, 244, 255). PFC Bell's reluctance to pay led to appellant's attempt to kill her (R. 96). Prior to his consummating the act of actually shooting PVT Bell on 10 October 1998, appellant planned and prepared for various ways in which to execute PVT Bell, enlisting various levels of assistance from at

---

[1] In fact, however, PFC Bell had no in-laws, as she had never been married (R. 231). PFC Bell only claimed to have in-laws, perhaps to avoid any embarrassment associated with having a child out of wedlock (*id.*). It was Gregory Strait, the father of her oldest son, who actually threatened to seek custody and at whom PFC Bell directed her animosity (R. 230, 235). Whether a guilty plea under these circumstances could be provident was recently decided in the affirmative by this Court in the companion case of *United States v. Roeseler*, 55 M.J. 286 (2001).

3

least six military servicemembers and one local national (PE 1 at p. 1-6; R. 97, 100-05, 147-54, 161-2, 169).

To carry out his planned shooting appellant constructed a makeshift rifle and silencer and acquired ammunition from a local national (R. 99-102, 113-14). On the night of the shooting, appellant dressed entirely in black to avoid detection, positioned himself in direct view of the guard shack on Fliegerhorst Kaserne where PFC Bell had duty, and waited (R. 106-8). When PFC Bell arrived, appellant aimed the cross-hairs of his weapon's scope directly at PFC Bell's head and squeezed the trigger (R. 108). PFC Bell screamed, began to shake, fell to her knees and then face down on the ground, blood coming from her neck (R. 109, 251, PE 1 at p. 6).

By pure luck, PFC Bell had pulled up the collar of her Kevlar Vest that night, which slowed the velocity of the bullet (PE 1 at p. 6). The bullet wound was 1-2 cm. wide and penetrated 3-4 cm. -- stopping just .5 cm. from her spine (*id.*). Surgery left a 2-3 inch scar on PVT Bell's neck (R. 252). Prior to the shooting, appellant pretended to be good friends with PVT Bell and her children (R. 148-9).

After the shooting, appellant escaped the scene in the pre-arranged get-away car (R. 154; PE 1 at p. 6). He disassembled his weapon and threw the parts out the vehicle, along with his black clothing (PE 1 at p. 6). After a few drinks at a club, appellant returned to the Fliergerhorst Kaserne, and upon hearing

of the shooting, feigned shock (*id.*, R. 155). However, appellant was visibly upset in front of his fellow conspirators because PFC Bell was not dead; he wanted to go back and do it over again (R. 154-5; PE 1 at p. 6). In the aftermath of the shooting and throughout the investigation, appellant expressed no remorse (R. 141, 155; PE 1 at p. 6).

Immediately after the shooting, the Kaserne went to Threatcon D (PE 1 at p. 7). Hundreds of soldiers were rousted from bed to provide additional security (*id.*). Access was denied to the Fliegerhorst Kaserne and curtailed at other Hanau Kasernes (*id.*). Five service members, in addition to appellant, were court-martialed as a result of appellant's "contract for murder" (appellant's Brief at p. 12).

In preparing for trial, appellant specifically requested that a forensic psychiatrist be appointed to his team to analyze the "possible interplay of narcotics upon mental health, especially the synergistic effect of drug mixing" (Request for Defense Expert and Consultant at p. 3, Allied Papers). Later, appellant requested by name, Dr. Caruso, Chief of In-Patient Psychiatry at Walter Reed Army Medical Center and Chief of Forensic Psychiatry at the National Naval Medical Center (R. 321; Request for Psychiatric Expert, Allied Papers). Appellant's right to have Dr. Caruso on his team was preserved in his offer to plead guilty (AE X). At appellant's guilty plea trial, Dr.

Caruso was used primarily as a sentencing witness on rehabilitation potential (R. 320-56).

On 8 February 1999 a sanity board ordered by the military judge found that appellant did not have a severe mental disease or defect at the time of his crime (AE IX and XV). This board also found that appellant had sufficient mental capacity to understand the nature of his proceedings and to conduct his own defense, or to cooperate intelligently in his own defense (AE XV). Finally, this board found that in light of repeated negative findings from medical examinations and laboratory tests (to include numerous visits with a neurologist), further medical testing to determine the extent of organic brain damage would have been superfluous (id.).

Additional facts necessary to resolve the assigned error are set forth in the arguments below.

### Issue Presented[2]

> WHETHER OR NOT GOOD CAUSE EXISTS TO ORDER A NEW TRIAL WHERE A DEFENSE OF ACCUTANE INDUCED PSYCHOSIS WAS NOT PRESENTED AT TRIAL BECAUSE THE PSYCHOTIC EFFECTS OF ACCUTANE WERE NOT KNOWN.

---

[2] Appellate defense counsel directs this Honorable Court's attention to those errors personally raised by appellant. The Government has reviewed these claims and submits that all lack merit. However, should this Honorable Court determine that the issues raised by appellant have possible merit, the Government requests an opportunity to submit further pleadings thereon. United States v. Grostefon, 12 M.J. 431 (C.M.A. 1982).

### Summary of Argument

The new evidence appellant cites, the potential adverse affects from Accutane use, were well known at the time of trial and could have been discovered with the exercise of due diligence. Moreover, there is no probability that this "new information" would have produced a substantially more favorable result for appellant. Appellant's detailed, calculated "murder for hire" scheme employing numerous co-conspirators did not evolve from a drug-induced psychosis. Therefore, a new trial is not warranted.

### Argument

#### A. Standard of Review

"A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused."

Manual for Courts-Martial, United States (MCM), R.C.M. 1210(f) (2000); see also UCMJ art. 73 (2000); *United States v. Young*, 43 M.J. 196, 197 (1995) (citations omitted); *United States v. Van Tassel*, 38 M.J. 91 (1993). However, appellant must first show

7

that there is something that brings into question his competency or lack of mental responsibility. *Young*, 43 M.J. at 197.

## B. Discussion

The potential adverse affects of Accutane do not call into question appellant's competency or lack of mental responsibility. Specifically, these adverse side affects include depression, psychosis, suicide ideation and attempts, and suicide. *See* Letter to Dr. Russell Ellison, dated February 1998 (Exhibit (Ex.) 1 to Appellee's Motion to Attach Documents (Motion)). Signs of the adverse affects include "feelings of sadness, irritability, unusual tiredness, trouble concentrating and loss of appetite . . . and suicidal thoughts." Accutane Victims Litigation Group, http://www.accutanelitigation.com (Ex. 2 to Motion). Symptoms include depression, insomnia, lethargy, loss of interest in school or work, fatigue, anorexia, irritability, and thoughts and acts of suicide. *Id.* None of these factors have anything to do with appellant's competency or lack of mental responsibility. Thus, appellant has failed to pass the initial threshold required for review. *See Young*, 43 M.J. at 197. In any event, appellant has also failed to meet the burden set forth in prongs (B) and (C) of MCM; R.C.M. 1210(f).

Appellant essentially argues that the potential psychotic affects of Accutane were not known until October 2000 when Congressman Bart Stupak's son, who was taking Accutane, committed

8

suicide. While this tragic event may have catapulted the Accutane/depression/suicide link to the forefront of public discussion among average Americans, there was a wealth of evidence prior to this time (and more importantly, prior to appellant's trial) percolating in the medical community and elsewhere that pointed to the same inevitable conclusion – Accutane may cause depression and suicide.[3]

Appellant was tried on 14 and 25 January and 19 March 1999 (R. 1, 13, 60). Prior to his trial, between 1982 and 1998 there were twenty-four cases reported in field literature addressing the psychological distress associated with Accutane use.[4] As early as June of 1985, the package insert for Accutane warned of depression as an adverse reaction to the drug.[5] In August of 1986 the pharmaceutical manufacturer of Accutane, Roche Laboratories, amended its package insert to state: "Depression has been reported in some patients on Accutane therapy. In some of these patients, this has subsided with discontinuation and recurred with reinstitution of therapy." More than ten years

---

[3] In June of 1982 the Food and Drug Administration (FDA) approved the use of Accutane for treatment of severe cystic acne. Accutane Chronology obtained from Congressman Stupak's webpage at http://www.house.gov/stupak/welcome.htm [hereinafter Accutane Chronology] (Ex. 3 to Motion). At first, the primary adverse affect was found to be birth defects to children of pregnant mothers who used Accutane during their pregnancy. Accutane Chronology, September 1983 entry (Ex. 3 to Motion).
[4] "Overview of Existing Research and Information Linking Accutane (Isotretinoin), Depression, Psychosis and Suicide," Presentation to the Congress of the United States House of Representatives Committee on Government Reform at p. 11, 5 December 2000 (Ex. 4 to Motion).
[5] Unless otherwise noted, all references in the Government's Brief to the chronology concerning potential adverse affects from Accutane were obtained from the Accutane Chronology referenced in note 3 *supra*.

9

before appellant's trial, in February of 1988 an FDA memorandum was published, concluding that "Given all the pieces of evidence available, it is difficult to avoid the conclusion that Accutane can adversely affect the adult human brain in clinically significant ways and that Accutane use is associated with severe psychiatric disease in some patients."

On March 3, 1997 French health authorities required Roche to add "suicide attempt" to the list of Accutane's side effects. In May of 1997 the FDA initiated discussions with Roche concerning reports of "serious psychiatric disorders" associated with their drug.

On 23 February 1998, the FDA issued a memorandum addressing "Isotretinoin [Accutane] and Depression," noting 506 cases of depression and 31 cases of suicide and suicide attempt or ideation associated with Accutane therapy. FDA Memorandum to Jonathan Wilkin, M.D (Ex. 5 to Motion). Two days later on 25 February 1998, and approximately one year before appellant's trial, the FDA required Roche to add the following new boldface warnings to its physician package insert:

> WARNINGS - Psychiatric Disorders: Accutane may cause depression, psychosis and, rarely, suicidal ideation, suicide attempts and suicide. Discontinuation of Accutane therapy may be insufficient; further evaluation may be necessary. No mechanism of action has been established for these events.
>
> ADVERSE REACTIONS - In the postmarketing period, a number of patients treated with Accutane have reported depression, psychosis

10

> and rarely, suicidal ideation, suicide attempts
> and suicide. Of the patients reporting
> depression, some reported that the depression
> subsided with discontinuation of therapy and
> recurred with reinstitution of therapy.

In February the vice president of medical affairs for Roche Laboratories sent out a "Dear Doctor" letter advising physicians of these important changes to its physician package insert. Letter from Dr. Russell Ellison, dated February 1998 (Ex. 1 to Motion).

On 25 February 1998 the FDA reported in their Med Watch, FDA Medical Products Reporting Program, that Roche Laboratories complied with the new FDA labeling requirements. Med Watch, New Safety Information Summaries 1998 (Ex. 6 to Motion). Apparently in conjunction with the labeling requirement identified above, the FDA also issued a "Talk Paper" prepared by their Press Office to provide answers to questions from the public on the depression/suicide information related to Accutane. FDA Talk Paper, dated 25 February 1998 (Ex. 7 to Motion).

In March of 1998, Great Britain and Ireland required warnings substantially similar to those required in the United States by the FDA, as referenced in bold *supra*. On 5 March 1998 the FDA issued a warning letter to Roche Laboratories, addressing its failure to account for the depression/psychosis/suicide affects associated with Accutane in its promotional materials. FDA Warning Letter to Patrick Zenner (Ex. 8 to Motion). Finally, in 1998, the year immediately preceding appellant's trial, 32

11

suicides and 20 suicide attempts related to Accutane use were voluntarily reported to the FDA's Adverse Event Reporting System. Accutane Serious Adverse Events Report 1998-2000 (Ex. 9 to Motion). Indeed, so much was being uncovered about the relation of Accutane to depression and suicide that the "Accutane/ Roaccutane Action Group Homepage" was established in 1998, as well. See http://www.roaccutaneaction.com/home.htm (Ex. 10 to Motion).

Undoubtedly, with the slightest exercise of due diligence this wealth of information could have been readily discovered. Thus, appellant has failed to meet prong (B) of MCM, R.C.M. 1210(f). The potentially adverse affects from Accutane are not new evidence.

Further, it is highly likely that appellant did, in fact, discover this information through his expert witness, Dr. Caruso, but Dr. Caruso found such evidence to be nugatory. The Government draws this conclusion based on appellant's request for expert assistance (Request for Defense Expert and Consultant at para.6, Allied Papers). Trial defense counsel explained in his request that a forensic psychiatrist was needed for the specific purpose of analyzing the effects that appellant's medications and other narcotic use had upon his mental health (id.).[6] In light of this charter, surely Dr. Caruso did the appropriate analysis.

---

[6] Appellant first requested a forensic psychiatrist, in general (Request for Defense Expert and Consultant, Allied Papers). Later, he then specifically requested Dr. Caruso by name (Request for Psychiatric Expert, Allied Papers).

12

However, apparently he was unable to incorporate his analysis and results into a defense because, simply put, depression and suicide have nothing to do with attempted premeditated murder, and nothing to do with appellant's competence or lack of mental responsibility. Dr. Caruso's testimony at trial indicates as much when he opined that the impact of medications on appellant was minimal (R. 340).

Appellant's assertion that Accutane "could cause a person to have delusional thoughts and act in a psychotic rage" is wholly unsupported by medical research.[7] Appellant's claim that appellant continues to act bizarrely while in confinement is an unsupported allegation.[8] Moreover, appellant's coined phrase, "Accutane Induced Psychosis," is misleading. The psychosis associated with Accutane use has never been shown to relate to anything other than depression and suicide. See, e.g., Accutane Victims Litigation Group, http://www.accutanelitigation.com (describing signs and symptoms of adverse affects) (Ex.2 to Motion). Indeed, the Government has found no documented evidence of Accutane ever causing a user to act out in a psychotic homicidal rage.

---

[7] As clarification, appellant's characterization of his acts as stemming from a psychotic rage is inaccurate. Rather, appellant acted in a calculating and deliberate manner when he planned and finally attempted to murder PFC Bell (See Statement of Facts supra).

[8] Appellant cites to Tab 16 in his Motion to Attach Documents as support for this allegation. However, Tab 16 is the "Testimony of Amanda Callais Before the Committee On Government Reform," dated 5 December 2000. Indeed, the Government has not located appellant's Miscellaneous Confinement Records anywhere in appellant's pleadings regarding his Petition for a New Trial.

13

Thus, if the evidence of depression and suicide resulting from Accutane use would have been considered by the court-martial, in light of all other pertinent evidence, there is no reasonable probability that appellant would have received a substantially more favorable result in his court-martial. *See* MCM, R.C.M. 1210(f) (2000); *see also Young*, 43 M.J. at 197. Accordingly, this Honorable Court should deny appellant's request for a new trial.

## Conclusion

WHEREFORE, the Government submits that appellant's petition for a new trial should be denied.

SUSANA E. WATKINS
Captain, JA
Office of The Judge Advocate
  General, U.S. Army
Appellate Government Counsel
(703) 588-5271


PAUL T. CYGNAROWICZ
Major, JA
Office of The Judge Advocate
  General, U.S. Army
Appellate Government Counsel


STEVEN T. SALATA
Colonel, JA
Office of The Judge Advocate
  General, U.S. Army
Chief, Government Appellate
  Division

## Certificate of Filing and Service

I certify that I served a copy of the foregoing personally on this Honorable Court, appellate military defense counsel, and appellate civilian defense counsel on this, the 17th day of November, 2001.

*Darline D. Bowman*
DARLINE D. BOWMAN
Paralegal Specialist
Government Appellate Division
901 North Stuart Street
Arlington, Virginia 22202-1837
(703) 588-6104

15

```
UNITED    STATES,      } MOTION TO ATTACH DOCUMENTS
              Appellee  }
                        }
        v.              } Crim. App. No. 9900316
                        }
Private E-1             } USCA Dkt No. 01-0794/AR
Kurtis E. Armann,       }
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,            }
United States Army,     }
              Appellant }
```

TO THE JUDGES OF THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

COME NOW the undersigned appellate government counsel, pursuant to Rules 9(d) and 30 of this Honorable Court's Rules of Practice and Procedure, and move that the Court admit in the instant case, the following attached documents: 1) "Dear Doctor" letter by Russell Ellison, M.D., Vice-President, Medical Affairs, Roche Laboratories, Inc., dated February 1998; 2) document entitled "Alert: Investigations Launched Concerning Severe Side Effects of Accutane," obtained from the webpage of Accutane Victims Litigation Group, http://www.accutanelitigation.com/; 3) Accutane Chronology obtained from Congressman Bart Stupak's webpage at http://www.house.gov/stupak/accutane_chronology.htm; 4) "Overview of Existing Research and Information Linking Accutane (Isotretinoin), Depression, Psychosis and Suicide," Presentation to the Congress of the United States House of Representatives Committee on Government Reform on 5 December

2000;[1] 5) FDA Memorandum regarding Isotretinoin (Accutane) and Depression, dated 23 February 1998; 6) Med Watch, The FDA Medical Products Reporting Program, "New Safety Information Summaries 1998;" 7) FDA Talk Paper regarding Important New Safety Information About Accutane, dated 25 February 1998; 8) FDA Warning Letter to Patrick Zenner regarding Accutane, dated 5 March 1998;[2] 9) 1998 excerpts from Accutane Serious Adverse Events 1998-2000 report; and 10) Accutane/Roaccutane Action Group Homepage obtained from http://www.roaccutaneaction.com/home.htm. The admission of these documents are essential to the resolution appellant's assigned error where he asserts that the potentially adverse affects from Accutane were not known prior to the date of his trial, and where he asserts that the potentially adverse affects from Accutane caused him to have delusional thoughts and to act out in a psychotic rage.

---

[1] Appellant also requested this Court to attach this document in Exhibit 13 of his Motion to Attach Documents (appellant's Motion to Attach Documents, filed 15 November 2001).

[2] Appellant has also requested this Court to attach this document in Exhibit 17 of his Motion to Attach Documents (appellant's Motion to Attach Documents, filed 15 November 2001).

WHEREFORE, the Government prays that this motion be granted.

| | |
|---|---|
| MOTION TO ATTACH DOCUMENTS | SUSANA E. WATKINS<br>Captain, JA<br>Appellate Government Counsel |
| GRANTED: _____<br>DENIED: _____<br>DATE: _____ | PAUL T. CYGNAROWICZ<br>Major, JA<br>Government Appellate Division |

### CERTIFICATE OF SERVICE AND FILING

I certify that I served or caused to be served a copy of the foregoing on this Honorable Court, appellate military defense counsel, and appellate civilian defense counsel on this the 17th day of December, 2001.

DARLINE D. BOWMAN
Paralegal Specialist
Government Appellate Division
(703) 588-6104

01 DEC 17 P2:

US ARMY JUDICIARY
2001 DEC 17 P 2: 16
CLERK OF COURT