IN THE
UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

| | | |
|---|---|---|
| UNITED STATES, | ) | MOTION TO ATTACH |
| | ) | DOCUMENTS        CA04-118E |
| *Appellee,* | ) | |
| | ) | |
| V. | ) | |
| | ) | Docket No. ARMY 9900316 |
| ARMANN, Kurtis E., Private, U.S. Army | ) | CAAF No. 01-0794/AR |
| 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 | ) | |
| *Appellant.* | ) | |

Pursuant to Rule 30 of this Court's Rules, undersigned counsel on behalf of Petitioner moves the Court to consider the attached documents in consideration of the Brief in Support of the Petition for a New Trial. The documents are relevant to the Petition, and, as such, the Court should grant the motion.

Exhibit 1, Statement and Verification Signed by Kurtis E. Armann (November 8, 2001);

Exhibit 2, Convening Authority's Action;

Exhibit 3, United States v. Armann, Docket No. 9900316 (A.C.C.A. April 24, 2001);

Exhibit 4, *United States v. Armann*, Docket No. 01-0794 (CAAF August 21, 2001);

Exhibit 5, Petition for a New Trial (August 9, 2001);

Exhibit 6, Letter from Joel D. Miller, Colonel, U.S. Army to Private Kurtis E. Armann, U.S. Army (August 15, 2001);

Exhibit 7, *United States v. Armann*, Order for Sanity Board (January 25, 1999);

Exhibit 8, Tab A, Redacted 706 Report Memorandum from W. Thomas Helfrich, Ph.D. (February 8, 1999); Tab B, Full 706 Report Memorandum from W. Thomas Helfrich, Ph.D. (February 8, 1999);

Exhibit 9, Medical Records Documenting History of Accutane Use;

Exhibit 10, Tabs A-M, Medical Logs Mannheim Confinement Facility;

Exhibit 11, A Double Dose of Heartache, Washington Post C1 (January 9, 2001);

Exhibit 12, CosmoGIRL (February 2001);

Exhibit 13, Overview of Existing Research and Information Linking Accutane (Isotretinoin), Depression, Psychosis and Suicide (December 5, 2000);

Exhibit 14, Opening Statement, Chairman Dan Burton, Government Reform Committee Hearing "Accutane–Is this drug linked to depression and suicide?" (December 5, 2000);

Exhibit 15, Statement by Jonca Bull, M.D., Government Reform Committee Hearing "Accutane–Is this drug linked to depression and suicide?" (December 5, 2000);

Exhibit 16, Testimony of Amanda Callais (December 5, 2001);

Exhibit 17, FDA Warning Letter (March 5, 1998); and

Exhibit 18, Misc. Medical Records.

Wherefore, the Court should grant the motion.

                                        Respectfully submitted,

                                        David P. Sheldon
                                        Law Offices of David P. Sheldon
                                        Barracks Row
                                        512 8th Street, S.E.
                                        Washington, D.C. 20003
                                        (202) 546-9575 (phone)
                                        (202) 546-0135 (fax)

                                        Mary M. McCord
                                        Major, JA
                                        Appellate Defense Counsel
                                        U.S. Army Legal Services Agency
                                        901 N. Stuart Street
                                        Arlington, Virginia 22203
                                        (703) 588-6047

## Certificate of Service

I certify that on November 15, 2001, I caused an original and seven copies of this Motion to Attach Documents to be delivered by courier to the Court and a copy was served by the same means by the Chief, Government Appellate Division, United States Army Legal Services Agency, 901 N. Stuart Street, Arlington, Virginia 22039.

David P. Sheldon

*Introduction*

This brief is submitted in support of the Petition for a New Trial filed with the Judge Advocate General of the United States Army by Private Kurtis E. Armann, U.S. Army in accordance with Article 73 of the Uniformed Code of Military Justice (U.C.M.J.), 10 U.S.C. § 873 and rule 1210 of the Rules for court-martial (R.C.M.). For the following reasons, the Judge Advocate General of the Army should grant the petition for a New Trial.

*Statement of the Case*

Pursuant to his pleas, the Petitioner was convicted of attempted premeditated murder in violation of Article 80 of the Uniformed Code of Military Justice, 10 U.S.C. § 880, conspiracy to commit murder in violation of Article 81 of the Uniformed Code of Military Justice, 10 U.S.C. 881, violating a lawful regulation, in violation of Article 92 of the Uniformed Code of Military Justice, 10 U.S.C. § 892, and wrongful use of marijuana in violation of Article 112(a) of the Uniformed Code of Military Justice, 10 U.S.C. § 992(a) at a general court martial at Mannheim and Hanau, Germany which was convened by the Commander of V Corps. (See Exhibit, Convening Authority's action) On March 19, 1999, the Petitioner was sentenced to 38 years confinement, to forfeit all pay and allowances, and to be dishonorably discharged from the Army. On August 10, 1999, the Convening Authority approved the forfeiture of all pay and allowances, and 35 years confinement. The dishonorable discharge has not been executed.

The Army Court of Criminal Appeals affirmed the findings and sentence in short opinion form on April 24, 2001 (Insert) In the interim, the Petitioner filed a Petition for a New Trial on August 9, 2001, which was subsequently referred to the office of the Examination and New Trails Division. (See Exhibit___, Letter from Col Miller, August 15, 2001) The Petitioner now submits this brief with supporting documentation in support of the Petition for the New Trial.

*Statement of the Facts*

<u>(Accutane argument)</u>

The Petitioner now submits new evidence, which casts doubt on both the crimes, the Petitioner committed and whether he could appreciated the wrongfulness of his conduct, and more importantly whether or not he was competent to stand trial. While the notion is addressed that the Petitioner was competent to stand trial, and that he did not suffer from a disease or mental defect which would render him responsible for his conduct. (See Exhibit 1, Enclosure 1, and Enclosure 2, Sanity Board Summary report, and Sanity Board supporting documentation by Dr. W. Thomas Helfrich) The day before the Petitioner's trial, the Petitioner was examined by LTCDR Keith A. Caruso, MC, USN, whom is a forensic psychologist, and he rendered an opinion and later testified "in the grand scheme of things, having had headaches throughout this period, having been on medications, many which have a depressing effect on mood, may have made things a bit

1

worse, but I don't think that there was any diminished capacity here"(Record of trial at 340)

Neither of the experts involved took notice of the fact that the Petitioner was an Accutane patient, and had had some very serious adverse reactions (physical) which the United States Army was separating the Petitioner from service. The issue of the Petitioner being an Accutane patient is addressed at trial. (See Record of Trial at 185, 186). At the time of the trial no one was aware of the battle between the FDA and Hoffman-LaRoche which would not be known to the public until December of 2000. Publicity concerning the suicide of Congressional Representative and the resulting congressional hearings informed the Petitioner and his counsel for the first time of the dangers of Accutane induced psychosis. (See Exhibit A, Enclosure 1, "A Double Dose of Heartache, Washington Post C1 and Enclosure 2, CosmoGirl [February 2001]) These hearings brought all sorts of information to the eye of the public, and later Congressman Stupak posted more information on his WebPages to help others and prevent this tragedy from happening again. A number of professionals testified at the hearing as well as "victims." The professionals involved were Jonca Bull from the FDA. (See Exhibit B, Enclosure 1) Dr. James O'Donnell a pharmacologist and professor at Rush University (See Exhibit B, Enclosure 2, pages 1-14). Also posted with this information was the FDA Meeting of the Dermatologic and Ophthalmic Drugs Advisory Committee, which was, subtitled "Accutane Associated Psychiatric Events" from September 19, 2000. (See Exhibit B, Enclosure 2, pages 14-28) Testimony at this meeting consisted of testimony from Roche Pharmaceuticals three doctors and legal representation. The company denies any link to their drug and the events, which led to the meeting. (See Exhibit b, Enclosure 2, pages 15-16) At the same meeting doctors from the FDA suggest a very serious link between Accutane and psychiatric disorders. The doctors from the FDA elaborate on their position stating good reason for there to be concern about the fate of this "miracle drug." Others would have a supportive role in informing Congress of their own stories and were called as witnesses in the case before Congress by Chairman Dan Burton. (See Exhibit C, Enclosure 1, "Opening Statement by Chairman") Mr. Burton called Amanda Callais, (See Exhibit C, Enclosure 2) Stacy and Mike Baumann, (No testimony available) and Charles Lubbock. (See Exhibit C, Enclosure 3) The testimony of these witnesses cast serious doubt on the claim that there is no casual relationship between Accutane and psychiatric disorders. While Congressional Representative Bart Stupak did no testify at this hearing he did make a statement on October 5, 2000, and he posted this statement on his website. (See Exhibit C, Enclosure 4) In all of the cases the "victims" had seemingly normal, and in some cases, above average lives. None of the parties involved were aware of the battle between Hoffmann-LaRoche and the FDA. The situation had even spread beyond the confines of our own country and into Europe.

The chronology of Accutane (See Exhibit D) and the constant battle with the FDA should be of interest to this court in this case. The most important thing to realize is that Roche has a reason to be deceptive about events and actions concerning Accutane. Accutane was Hoffman-LaRoche's second largest selling drug in 1998 netting over eight hundred million dollars in sales. Accutane is considered the only "cure" for cystic acne that is on the market and in many ways a one-of-a-kind drug. Regretfully, even the FDA,

the regulating agency, plays a role in these issues. They have tried to make things right with their honesty on this subject, which is an issue to anyone who has children. In February 1988, the FDA issued a memo stating that the company "had not acted in good faith" in regard to Accutane and birth defects. This same memo also concluded that "Given all of the pieces of evidence available it is difficult to avoid the conclusion that Accutane can adversely affect the adult brain in clinically significant ways, and that Accutane use is associated with severe psychiatric disease in some patients." This should have been a cue for the FDA to ensure that this product should be investigated further. On March 3, 1997 French health authorities required Roche to add "suicide attempts" to the list of side effects. Roche does not act in good faith and inform the FDA in the U.S. of the updated warnings. In May 1997, the FDA discusses with Roche reports of psychiatric disorders associated with the use of Accutane. Roche still withholds the new French warning from the FDA. In August 1997, the FDA issues another warning letter to Roche for failing to submit averse events report in a timely manner. Roche claims that it's computers are responsible for delays of up to eight years in complying with the law. On February 23, 1998 the FDA issues a memorandum to the Division of Dermtologic and Dental Drug Products. (See Exhibit E) Under table 1 some of the terms used are "Depression psychotic" and "suicide. Page 4 of the memorandum Paragraph B, Fatal Suicide Reports, reads in part, "For the majority there was no antecedent history of depression, and the patients were not known to be depressed in the period prior to their suicide." This fact is also restated in the summary portion of the memorandum. This report almost perfectly matches the testimony of the "victims" who became sick or lost someone due to suicide. On February 25, 1998 the FDA requires Roche to add warnings concerning psychosis to the label. (See Exhibit E, Enclosure 2, FDA Med Watch Report) Roche claims in a press release that there is no proof to these facts and that "teenagers are a particular risk for depression." The FDA is still unaware of the French warning. In March 1998, the U.K and Ireland require warnings of psychiatric disorders similar to the ones in the U.S. On March 5, 1998 the FDA issues another warning letter to Roche requiring Roche to cease "false and misleading" advertisements which promote Accutane as an "effective treatment of severe acne....[that] minimizes negative psychosocial effects such as depression and poor self-image." (See Exhibit F, Enclosure 1, Warning letter) In July of 1998, the FDA became aware that French authorities had already required the addition of the warning "suicide attempt" after a study linked Accutane to depression, and of Roche's failure to disclose this information to the agency.

The Petitioner asserts that the warnings in relation to Accutane indicate that these health concerns may be an issue even after treatment has ceased. (See Exhibit G, Enclosure 1, paragraph 2) and (Exhibit G, Enclosure 2, Manufacture's warnings, psychiatric disorders, "Discontinuation of therapy may be insufficient further evaluation may be necessary."

Lastly, in addition to psychological problems that exist, he also suffers from severe physical problems, which occurred during the last portion of his cycle of Accutane and persisted and grew more severe after use. Some of the more severe disorders are chronic fatigue, malaise, weight loss, insomnia, severe migraine headaches, severe reaction to artificial and natural lighting, and some visual disturbances. (See Exhibit G,

Enclosure 2, Warnings). The Petitioner suffers from these disorders on a daily basis, and has even been given a physical profile to keep his eyes shielded from the light and limit exposure to the sun. (See Exhibit H, Enclosure 1)

### Argument II

### (Substance induced psychosis)

In the Petitioner's case the stipulation of fact and admission of guilt before the court is a confession. The facts of the types and amounts of medications the Petitioner was on at the time of the crimes and at the time of the court-martial are totally void from the record. This presents a very serious issue because the court accepted the Petitioner's pleas, which he was intoxicated. The intoxication was not voluntary, and the effects of the mixing of all of these drugs are not known. All of the medications contained in this brief are all prescription. While it could be argued that the Petitioner could have stopped taking these medications while on active duty, it can not be argued that he could do so while in confinement. In confinement not taking medication would definitely result in disciplinary action. (See Exhibit 3, Enclosure 1, "Institutional misconduct") On active duty the prescription should be followed as a lawful order, and could also result in disciplinary action, such as breaking quarters. It would be much easier to disobey the doctor and not take the medication but there would be no reason to do so because a doctor is supposed to know that certain interactions are not a wise decision. Regardless of what the doctor is supposed to know or not know, in the case of the Petitioner, dangerous medical practice in regard to medication did on fact take place.

At the time of his arrest, the Petitioner was indicated as being on four medications at the time of his arrest. This was indicated by the Mannheim Confinement Facility on 16 October 1998. This is after four days of interrogation by the Hanau CID. The four medications that the prison indicates the Petitioner was on are Elavil, Firocet, Compazine, and Amitryptaline. Actually this would only be three because Elavil and Amitryptaline are the same drug. (See Exhibit 3, Enclosure 2, Medical examiner's Report) The Petitioner's medical records reflect that he was on more than those at the time of the incident. One of those left out was Secobarbital (Seconal). Others who knew the Petitioner as well as in his records know it both. The Petitioner puts a certain amount of emphasis on this fact because of this drug's relationship to the drug Amytal (Amobarbital). Amytal is used as injectable sodium and is employed as "truth serum" in a process called narcoanalysis. This is the process of using drugs to solicit highly defended thoughts and feelings as a means of the "truth." The drug Seconal and Amytal only differ in composition slightly, one molecule. Whether the confession at the time of arrest was illegal or not is a concern for a new trial, and not this petition in particular. What is an issue is that if this drug can alter the function of the brain in ways that are significant enough to alter normal thought processes. The condition of the Petitioner at the time of his arrest is also of concern to the court due to the fact that what prompted the Military judge to order the R.C.M. 706 "Sanity Board" prior to the court-martial was the confession of the Petitioner. Until the issue of Accutane started to be pursued by counsel

4

as "new evidence" dangers that existed in the pain regiment the Petitioner was on were also unknown. Scoonal is the only known drug of the medications the Petitioner was taking due to it's potential for abuse and that it is a Schedule IV substance. Moreover, even though it is would be considered the most potent standing alone it is not necessarily the most dangerous. Certain combinations of drugs can have detrimental effects on physical and psychological functioning.

Relying on the information in the confinement physical (See Exhibit 3, Enclosure 2, Medical Examiner's Report) eventhough the list is a partial list of what the Petitioner was on it is enough to raise significant doubt. Two medications of such concern are Compazine and Elavil as reflected by the physical. In cross-referencing those two medications with the "Med logs" you can also see that the Petitioner was also on a drug named Phenergan. Through tabulated data the Petitioner found:

### Interaction 1

Compazine and Phenergan are phenothiazine derivatives. (See Exhibit 2, Enclosure 1, par. A1, Compazine) and (Exhibit 2, Enclosure 2, para. A2, Phenergan) The fact that these drugs are phenothiazine drugs is central to the argument. Compazine is the most complex of the pair because it is also an antipsychotic, which is listed in the same drug family as Thorazine, a more known psychiatric drug. Elavil is a tricyclic antidepressant (TCA). Just as the drug Seconal, these drugs standing alone are usually not an area of concern, but combining them can have serious and unknown consequences. Elavil is metabolized (broken down by the body) by an isozyme called P450IID6. Compazine and Phenergan can inhibit (disable) this enzyme. The result would be that someone on a stable dose of TCA's such as Elavil could become abruptly toxic. (See Exhibit 2, Enclosure 3, par. A3) This is a very serious condition because a toxic amount of Elavil is very close to an overdose. Complicating the situation more is that Compazine has several other traits, which would cause to toxic exposure to pass as something else or be totally disregarded. Compazine can prevent vomiting, and obscure signs of toxicity and disease due to drug overdose. (See Exhibit 4, Enclosure 4, The Pillbook 9th Edition, page 846) This presents a situation because someone could have something very serious occurring, but not ever be totally aware because it does not follow the "textbook" symptoms of a drug overdose. Signs of toxic Elavil exposure are:

- Hallucinations
- Delusions
- Disturbed concentration
- Abnormal thinking
- 
- 

The disturbing thing about those signs and symptoms are that they mimic major mental illness.

### Interaction 2

5

Another very serious interaction is that of Seconal and Paxil (paroxatine hydrochloride). It is a very little known interaction because to be able to identify this interaction one would have to have knowledge of pharmacology. Seconal, while being absorbed by all body tissues within minutes, is bound to plasma and lipid proteins. Paxil is also bound in such a manner, and can actually displace other drugs bound in the same manner. The result is that the Paxil would bind to the protein and Seconal would be displaced in a greater than normal amount in the bloodstream. This would only tend to intensify the already significant effects this drug were having on the body as a whole. In addition to this the Petitioner was also on Fircoet during the commission of the offenses. Fircoet contains a drug called Butalbital, which is a short-acting barbiturate identical to the active ingredient in Seconal.

This information would disqualify a psychiatrist or psychologist from evaluation. A three-man board with one of each and a Pharm D. and a toxicology screening could make an assessment but not one of each sitting alone.

Taking only those two interactions indicated above as diagnostic criteria at the time of the crimes, more factors come into play in this type of situation. The Petitioner was on these medications at the time of his offenses, and had no knowledge of interactions that could have been taking place. Moreover, the type of effect that they had when combined together would pass as mild intoxication, but was more severe than that. Months before the incident the Petitioner reported that "at times my vision becomes distorted and I see things." It is reported in his medical records in certain places, but because no one knew that a situation existed and that the "visual distortions" could have actually be transient hallucinations the situation was never pursued as possible psychosis. The Petitioner was seen on several different occasions by a psychiatrist, as well as a psychologist to manage psychological problems that stemmed from several different sources. On September 22, 1997, the Petitioner attempted to have himself seen on an inpatient basis at the Landstuhl Regional Medical Center, Germany. (See Exhibit 6) The request was downgraded and the Petitioner was placed on quarters for 24 hours. At this point the problems that the Petitioner was having were disregarded as a side effect of the numerous medications he was on or from the type of pain that he was experiencing. It is never considered that there could be something that was an underlying causation of the problems. In addition to the quarters more medications are added to the Petitioners regiment a few days later, so if a real problem did exist it would only be covered up. By January of 1998 the situation was progressing and any type of health professionals for psychological problems was not seeing the Petitioner, but the Fleigorhort Aid Station was seeing him weekly for pain attacks on his post in Germany. The Petitioner was receiving Elavil in an oral dose, but was receiving Compazine, and Phenergan in a stabilizing dose by mouth, and on an emergency basis by injection. In addition to these three medications the Petitioner was also on Seconal, and many other drugs as part of a neurology regiment. There are in fact so many medications the Petitioner was on at the same time that in most cases looking at the health record does not help because the medications are listed from several different sources. The Petitioner was also on antidepressants but only had to have them refilled and did not have to see a doctor as a precaution. Finally in May of 1998 the Petitioner was given an Article 15 for using marijuana, and was pending discharge as a

6

result. In the psyche evaluation the Petitioner had stated that he had come into contact with a large sum of money as the result of a lawsuit. Previous to this the Petitioner had suspected that his Accutane use had caused problems, but there was no type of litigation against the company. (See Exhibit 5, Psyche records misc.) The Petitioner's thought processes were not clear, and the Petitioner's former squad leader, SGT KAREN Minter, who stated "Armann was always doing things that just didn't make any sense", speaks this at the trial On October 10, 1998 the Petitioner commits attempted murder in a conspiracy that lasted eight months.

As stated before the Petitioner does not raise the issue of an illegally obtained confession, this is something that must be tested by court-martial. The mind altering effects of Seconal are documented enough to make judgement. What the Petitioner does cite is the substance of the confession itself. In this confession (s). First he says that he did not intentionally do it, then it changed to his admission of guilt, then it takes on a more bizarre turn. The Petitioner admits to formally being employed by a crime family out of Ohio, and that he had worked for them before his enlistment into the Army. This is the same story which he was telling people before the incident. I want the court to take into consideration that the Petitioner was admitting to first degree murder before he was ever caught or committed any type of crime. He did not just build himself up to his circle of friends as the prosecution stated in the trial. The truth is that is someone, anyone, who carried on a conversation with the Petitioner for any length of time would hear this same statement of being a hired murderer for a crime family. The fact that the Petitioner constructed a weapon should be another factor, which pointed to illogical thought processes. Everyone that is stationed in Germany knows that a "black market" does exist, as it does in the United States. Making a local purchase for fewer than five hundred dollars on such a market or trading something of value for an untraceable weapon is more economical. The concept of "making" poison is just as illogical as constructing a weapon. In Germany, the availability of herbal solutions is a competitive market due to the preference of herbal remedies over prescribed medication. Some of these herbs are extremely lethal, such as belladonna, or atropine. These herbs are available over the counter in Germany. The Petitioner believes that there was no type of poison ever constructed or in his possession and that it was part of a drug induced paranoid fantasy. The prosecution put all of these facts as "methodical, and premeditated," but they could not have been further from the truth.

After confinement the situation only got worse as far as the Petitioner's mental state, and the situation which had been clearly pointed out to this court concerning the medications the Petitioner was prescribed by healthcare professionals. As stated in the first part of this brief the Petitioner was listed as being on three medications the time of his arrest, but at the time of trial the existing medications that the Petitioner had been on previously had been increased and more added to them. By the time the Petitioner made it to trial he was listed as being on ten (10) and even then this number could be lower due to missing records. Now, the option of voluntarily taking the medications was not an option for the Petitioner, failure to take them could be punishable under the rules of the prison. Out of the ten medications the Petitioner was on several were prescribed beyond limits, which were considered safe. Seconal had a daily range of 200mg per day, but the day of 18

7

March 1999 the records clearly reflect that he had taken 400mg that day as well as the day of 19 March 1999 which is the day of his court-martial. In addition to the drug Secomal, the Petitioner was also on the drugs Fironal, and Firocet, which are also barbiturates, which contain the drug butalbital. The recommended dosage of these drugs is one to two tablets every six hours. In addition to this they are not supposed to be taken together because the drugs are almost identical. Fironal is aspirin, caffeine, and butalbital, and Firocet is acetaminophen, caffeine and butalbital. The only difference is one is aspirin, and one is acetaminophen. The day of the Petitioner's trial, and the time leading up to the trial the Petitioner was prescribed three tablets every six to eight hours and both of the drugs at the same time. Taking all of these drugs <u>as prescribed and ordered</u> could have easily put the Petitioner into the range of <u>toxic exposure</u>. Under normal circumstances taking one of these drugs by itself would cause a mild amount of sedation. The sedation would be enough that it would not be safe to operate a motor vehicle, and under German laws if you are suspected of operating a car while intoxicated and pass the "breathalyzer" they will draw blood to test for other drugs. Having a normal dose of <u>one</u> of these drugs would be enough to be considered intoxicated. Another very disturbing side effect is listed from the PDR 2001 (Enclosed) and it concerns specifically using barbiturates for chronic and or acute pain. This is the reason that the Petitioner was prescribed this drug. It can potentate something called *paradoxical excitement*. Apply the logic and add only the two other drugs to this and increase the dosage. Any pharmacologist is going to say that this is unsafe and could have fatal consequences. This is only three out of ten or eleven drugs the Petitioner was taking at the time of trial. The other drugs Compazine, Phenergan, Elavil, etc. only go on to say that they would only intensify the effects of one another and more specifically the barbiturates the Petitioner was prescribed. Building up a tolerance to a medication is one thing, but being exposed to a toxic amount is another. The facts are that the Petitioner was exposed to enough of these drugs to be considered significantly impaired, and that the situation that leads up to the commission of the offenses supports the issue that the Petitioner was impaired and his thought processes were not rational.

Mr. Sheldon I know that you know the power if the defense of insanity, and now in addition to that there is an issue of involuntary intoxication so attached to this is a listing of arguments from the Supreme Court and Federal Court as well as the military side.

The Supreme Court in the case of *Riggins v. Nevada*, 112 S.Ct 1810; held that;

"<u>It was an error for the defendant to de administered antipsychotic medication during the course of his trial over his objections without findings that were no less intrusive alternatives, that the medication was medically appropriate, and that it was for the sake of the defendant's safety or the safety of others.</u>"

*Riggins* also held that;

8

"The forced administration of antipsychotic medications during the trial violated rights that are guaranteed by the Sixth and Fourteenth Amendments.

"There is a strong possibility that the Court's error impaired *Riggin's* constitutionally protected rights. Efforts to prove or to disprove actual prejudice from the record would be futile, and guesses as to the outcome of the trial outcome had the *Riggin's* motion been granted would be speculation. While the precise consequences of forcing Mellaril upon him can not be shown from the record of trial transcripts, the testimony of the doctors who examined him establishes the strong possibility that his defense was impaired. Mellaril's side-effects could have not only impacted his outward appearance but also his testimony's content, his ability to follow the proceedings or the substance of the communication with his counsel. Thus, even if the expert testimony allowed jurors to assess *Riggin's* demeanor fairly, an unacceptable issue remained that forced medication violated his rights at trial."

The case of *Riggin's* also yielded information on the effects of these antipsychotic medications and specifically how they affect the brain. I add this because Compazine as I mentioned to you is an antipsychotic medication and it is the same family as Thorazine and Mellaril. While this argument centers partially on my ability at trial it is also an issue because I was on the same drug while on active duty and I was not being treated for psychosis.

"In the case of antipsychotic drugs like Mellaril interference is particularly severe." Id at 1814

"The purpose of these drugs is to alter the chemical balance in the patients brain, leading to beneficial effects in his or her cognitive processes. While the therapeutic benefits of antipsychotic medications is well documented, it is true that these drugs can have serious, even fatal side-effects." Id at 1814

Also established in *Riggins* was;

"Due process prohibits officials from administering involuntary doses of antipsychotic medications for the purpose of rendering the accused competent for trial"- "state command medication during pretrial phases of the case for the avowed purpose of changing the defendant's behavior, *is much the same as prosecution manipulating evidence*." Id at 1827

The Supreme Court in the case of *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735; held that;

"The test of admissibility of confessions as voluntary was whether state officials behavior had been such as to overbear defendant's will to resist and to bring about confessions not freely determined, not the probable truth or falsity of confessions." U.S.C.A. Const. Amend. 14, Id at 739

9

Mr.Sheldon, whether we attack the confessions themselves now or on direct appeal is an issue of concern for me. I would prefer to attack it as new evidence because of the substantial caselaw that says that it is wrong to use such information.

Also in *Rogers v. Richmond*, was;

"Convictions following admissions of involuntary confessions can not stand regardless of the trustworthiness of the confessions." U.S.C.A. Const. Amend. 14; Id at 739

In the Federal case of *Nguyen v. Reynolds*, 131 F.3d 1340; held that;

"Trial of a incompetent prisoner violates substantive due process" U.S.C.A. Const Amend. 5, 14

The Supreme Court in the case of *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 155 L.Ed 2d 640 (1991); held that;

"Generally, federal habeas review of procedurally barred issues is foreclosed "unless the prisoner can demonstrate cause for default and actual prejudice as a result of alleged violation of federal law, or demonstrate that failure to consider the claim *will result in a fundamental miscarriage of justice*."

The Fifth Cir. Federal Court in the case of *U.S. v. Williams*, 819 F.2d 605, 609 (1987)

"...to raise doubt [the Petitioner] must positively, unequivocally, and clearly generate a real substantial claim and litigate doubt *concerning his mental capacity*..."

The Supreme Court in the case of *Pate v. Robinson*, 363 U.S. 375, S.Ct. 836; held that;

" Upon determination of the abridged Constitutional rights of the accused by his failure to receive an adequate hearing on his competence to stand trial, a writ of Habeas Corpus must be issued an the accused must be discharged, unless he is given a trial within a reasonable time" U.S.C.A. Const Amend 14, Id at 842-843

Mr.Sheldon the last case that I am going to cite is another Supreme Court case; but I cite this case in particular because it directly attacks the standard of present sanity. I also cite this case because it was obviously the same standard that was used on me in 1997 when I tried to have myself committed, and was placed on quarters instead.

The Supreme Court in the case of *Dusky v. U.S.*, 362 U.S. 388, 80 S.Ct. 788; held that;

"The test of a defendant's competency to stand trial is whether he has sufficient [present] ability to consult with his lawyer with a reasonable degree of rational understanding; and whether he has rational as well as factual understanding of the proceedings against him; <u>and it is not enough that he is oriented to time and place with some recollection of events.</u>" <u>Id</u> at 735.

11

(Involuntary Intoxication)

Argument III

It has been established through the course of the Petitioner's documentation that he was under the influence of multiple substances. (See Medication logs) and that the ████████████████████ but voluntary. (See Exhibit 3, Enclosure 1, Inmate request █████████████████████ a medication, especially one that would render him incompetent, violates his rights, and at the same time it is an affirmative defense to charges.

At common law, involuntary intoxication is a defense to a general intent crime. R. Perkins and Boyce, *Criminal Law* (hereafter) 1001 (3.Ed. 1982)

It [involuntary intoxication] rises to the level of an affirmative defense, however, only if it amounts to legal insanity. *U.S. v. F.D.L.* 836 F.2d 1113, 1116, (8th Cir. 1988) ("[T]he mental state of an involuntarily intoxicated is measured by the test of legal sanity.") See also § 2.08 (4) ALI Penal Code, reprinted in *ALI Model Penal Code and Commentaries* (hereafter *Commentaries*) (Part I) 349 (1985)): 2 *Wharton's Criminal Law* § 113 at 126 (C. Toria 15th Ed.); Perkins; *supra*, at 1005; annotation *When Intoxication Deemed Involuntary as to constitute a defense to a criminal charge*, 73 ALR 3d 195, 199, 1976

## Verification

I declare under penalty of perjury that the foregoing is true and correct pursuant 28 U.S.C. § 1746. Executed on this 8th day of November, 2001.

KURTIS E. ARMANN
Private, US Army