# Exhibit G

# APPENDIX A

Pursuant to *U.S. v. Grostefon*, 12 M.J. 431 (C.M.A.1982), appellant, through communication with counsel, personally requests that this Honorable Court consider the following in determining whether to approve the bad conduct discharge in his case:

1. Lack of Complete Mental Responsibility for Offenses.

The previous version of R.C.M. 916(k) in effect before November 14, 1986, reflected a two-tier approach. R.C.M. 916(k)(1) stated the then-prevailing "substantial capacity" formula as a complete defense. R.C.M. 916(k)(1) provided:

> It is a defense to any offense that the accused was not mentally responsible for it. A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacks substantial capacity to appreciate the criminality of that person's conduct or to conform that person's conduct to the requirements of law. As used in this rule, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial behavior.

R.C.M. 916(k)(2) articulated the incomplete defense of *"Partial mental responsibility,"* described as follows:

> A mental condition not amounting to a general lack of mental responsibility under subsection (k)(1) of this rule but which produces a lack of mental ability at the time of the offense to possess actual knowledge or to entertain a specific intent or a premeditated design to kill is a defense to an offense having one of these states of mind as an element.

In 1988, the Court of Appeals for the Armed Forces (CAAF), recognized the defense of diminished mens rea continued to exist in the military courts in the case of where CAAF stated that the "all or nothing" set of options "raises obvious constitutional concerns" if RCM 916 was construed to keep the accused from attacking the *mens rea* element directly. *United States v. Curtis,* 44 MJ 406 (1996) citing *Ellis v. Jacobs*, 26 M.J. 90, 92 (1988).

Under article 50a, it is an affirmative defense in a trial by court-martial that at the time of the commission of the acts constituting the offense, the accused as a result of a sever mental disease or **defect**, was unable to appreciate **the nature and quality or** the wrongfulness of the acts.   The current RCM 916(k) reflects this same rule.

It is a basis for ordering a post-trial hearing pursuant to *United States v. Dubay*, 37 CMR 411 (CMA 1967) where new evidence of an accused's mental capacity at the time of the offense or court-martial is discovered.   *See generally*, *United States v. Thomas*, 34 MJ 788 (ACMR 1992).   Post-trial diagnosis of paranoid schizophrenia, rendered approximately 6 weeks after trial, created sufficient doubt to warrant further inquiry into accused's mental capacity and original action would thus be set aside. *United States v. Massey*, 26 M.J. 671 (AFCMR 1988).

Since arriving at the Disciplinary Barracks, appellant was evaluated by mental health specialists and placed on various medications including:

1. Risperdal - a medication for treating schizophrenia and psychotic disorders,

2. Thorazine - an anti psychotic drug of low-potency used in the treatment of disorganized and psychotic thinking,

3. Lithium Carbonate - the primary treatment for manic depression,

4. Desyrel - used to treat the symptoms of depression.

5. Elavil - an antidepressant with sedative effects

6. Paxil - used as an antidepressant

7. Depakote - used to treat epilepsy, bipolar disorders and migraine headaches.

Additionally, appellant has undergone counseling to resolve his mental health issues. Appellant now realizes that at the time he committed the offenses he was not able to completely comprehend his unrecognized emotional and behavioral defects that in turn prevented him from fully understanding the nature and quality of his actions in light of the circumstances.

At the time that appellant shot PFC Bell, he unconsciously transferred all his unrecognized and built-up rage stemming from his childhood onto her. During the time prior to the shooting that appellant made plans to kill her, he did not really intend

4

to do so.  One part of appellant wanted and needed to continue to be her friend but another part of him wanted to prove up the status he claimed.  When PFC Bell sent her children back to the States and lied to appellant about why she was not bringing them back, appellant became enraged.

Appellant's childhood was horrible.  He does not wish what he went through with his step-mother, Beverly, and father on anyone.  He was kicked, beat, hit, yelled at and made to feel like trash.  Throughout this torture, his father did nothing to help.  Appellant felt that everyone had abandoned him.  He lived in constant fear from the time he was about 3 years old until he was about 11 years old and went to live with his mother.  Later, appellant gave his father a second chance and went back to live with him when his father promised that things would be better.  Tragically, this was a lie and all the abuse started again when his father let Beverly return.  Appellant did not realize it until later but he developed a intense hatred for his father.  He also didn't realize that he developed bitter feelings for his mother who he blamed for abandoning him during the time he was with his father.

Because appellant did not recognize his mental problems, he could not resolve his emotions and control his impulses.  When he developed a relationship with PFC Oie and learned that she had been raped, appellant could not suppress his rage and sought

mental health counseling.  However, appellant never really dealt with all his issues and grew angrier and angrier.

When appellant first learned of PFC Bell's situation, he felt that he could help her and play up the image of a hitman that others in his unit had of him.  He gathered material and notified every one of his plans to carry out a hit on PFC Bell's in-laws.  He never knew that she gave him false information because he never checked.  He saw in PFC Bell his own mother and wanted to help her get her children back.  When she finally got custody of her children, appellant was personally happy because he felt vindicated in a way.  However, PFC Bell soon sent her children back allegedly because she could not take care of them. When she lied to him that her son could not fly back to Germany because of the cast, appellant lost control of his anger again. Appellant did not understand why he could not let go of his anger towards PFC Bell.  It was not about the money but about appellant's feeling that PFC Bell's children were going to suffer just like he did.  Instead of solving everything by helping her get her children, appellant saw the situation as PFC Bell giving her children hope that they would have a better life and then snatching that hope away.  He did not know then but now sees that he really saw his sister and himself.

As appellant told the trial judge during the court-martial, throughout the months before the shooting occurred, he stalled

because he really didn't plan on carrying out the shooting.

Everyone thought he wanted money from PFC Bell but he knew she

didn't have $50,000. He couldn't stop the chain of events so he

played along never intending to use the poison or the bomb to

hurt PFC Bell. Near the end of that time, however, his anger

against PFC Bell evolved into a rage as he could not stop

thinking about what her children were going through. He did not

know of anything bad happening to them but he just kept thinking

that something would. On the day that appellant shot PFC Bell,

he was scared. He didn't mean to kill her but felt he had been

forced to carry out the plans other soldiers and him had been

talking about for months or they would think he was liar. He

could not stop himself. The thought of failing in front of

those other soldiers gripped appellant like an ice fist around

his heart. Appellant now realizes that his illogical fear came

from his uncontrollable compulsion never to be demeaned in front

of others like he had been with Beverly and his father. This is

the same compulsion that had caused him so much pain when he

learned PVT Oie had been raped. He felt that her rapist got

away with it and appellant, as her protector, could do nothing

about it. He felt weak and helpless.

After everything bad happened, appellant came to a point

where he tried to commit suicide. He just did not want to face

7

up to what he had done.  He sees that suicide is not the way out, however.

Appellant only discusses some of the problems that he was facing at the time he fired the shot at PFC Bell because he wants this Court to see that he did not and could not control himself.  He was not in a logical state of mind.  He knew what he was doing when he pulled the trigger but the mental, emotional and social situations surrounding him had overcome any sense of right or wrong.  He could not control himself. Appellant urges this Court to consider his mental state and documented background of abuse in deciding whether to affirm, reduce or set aside the findings and sentence in his case.

WHEREFORE, appellant respectfully requests that this Honorable Court reduce the sentence to confinement to no more than 10 years.  Ideally, appellant would like this court to set side the findings altogether.

2.  <u>Unreasonable Multiplication of Charges</u>

Charge I and Charge III were multiplicious and an unreasonable multiplication of charges.  The conspiracy to commit the attempted murder should have been merged into the attempted premeditated murder charge for sentencing.  What is basically one transaction should not be the basis for an unreasonable multiplication of charges against one person.  RCM (RCM)

8

307(c)(4) Discussion.  Also, if there was a unity of time and the existence of a connected chain of events, the offenses may not be separately punishable depending on all the circumstances, even if each required proof of a different element.  RCM 1003(c)(1)(C) Discussion.  Military judges must still exercise sound judgment to ensure that imaginative prosecutors do not needlessly pile on charges against a military accused.

That is what occurred in appellant's case.  The conspiracy to commit murder was part and parcel to the premeditation in involved in the attempted murder.  The attempt was the culmination of the conspiracy.  As such, appellant should not have been sentenced separately for these offenses.

WHEREFORE, appellant respectfully requests this Court to set aside and reassess his sentence.